FILED

2020 Feb-21 PM 04:24
U.S. DISTRICT COURT
N.D. OF ALABAMA



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## BIRMINGHAM DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, THE COMMONWEALTH OF MASSACHUSETTS, THE COMMONWEALTH OF VIRGINIA, AND THE STATES OF CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OKLAHOMA, TENNESSEE, TEXAS, and *ex. rel.* [UNDER SEAL],<br><br>              Plaintiff-Relator,<br><br>v.<br><br>[UNDER SEAL],<br>              Defendants. | QUI TAM COMPLAINT<br><br><br>FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730(B)(2)<br><br><br>DEMAND FOR JURY TRIAL<br><br>Civil Action No.<br>_____ |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## BIRMINGHAM DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, THE COMMONWEALTH OF MASSACHUSETTS, THE COMMONWEALTH OF VIRGINIA, AND THE STATES OF CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OKLAHOMA, TENNESSEE, TEXAS, and *ex. rel.* JAY MEYTHALER, M.D., | QUI TAM COMPLAINT |
| | FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2) |
| | DEMAND FOR JURY TRIAL |
| Plaintiff-Relator, | Civil Action No. _____ |
| v. | |
| ENCOMPASS HEALTH CORPORATION, and individually ROBERT RUSSELL and MICHAEL BARTELL, | |
| Defendants. | |

## <u>INTRODUCTION</u>

1.     This is an action to recover treble damages and civil penalties in excess of $250 million on behalf of the United States of America, the Commonwealths of Massachusetts and Virginia, and the States of California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Tennessee, and Texas (collectively "Federal and State Payors") arising from false statements and claims made, or caused to be made, by the Defendants to the United States and its agents and intermediaries in violation of the federal False Claims Act ("FCA") and corresponding state False Claims Acts.

2.      JAY MEYTHALER, M.D brings this action on behalf of the United States of America ("Government") and the Commonwealths and States listed herein against Defendants, ENCOMPASS HEALTH CORPORATION, ROBERT RUSSELL and MICHAEL BARTELL for treble damages and civil penalties for their violations of the FCA.

## JURISDICTION AND VENUE

3.      This action arises under the False Claims Act, 31 U.S.C. § 3729 et. seq.  This Court has exclusive jurisdiction over the case pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1345; and 31 U.S.C. § 3732(a).

4.      Venue is proper in this District because the acts proscribed by 31 U.S.C. § 3729, and complained of herein, took place at health care facilities where Defendants conducted business in the Northern District of Alabama, pursuant to 31 U.S.C. § 3732(a). At all relevant times the corporate Defendant conducted business and the individual Defendants resided in the Northern District of Alabama so venue is also proper pursuant to 28 U.S.C. § 1391(b) and (c).

5.      This Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days, and shall not be served on the Defendants until the Court so orders, in accordance with 31 U.S.C. § 3730(b)(2).

6.      Relator has provided the Government with a copy of the Complaint and/or written disclosures of substantially all material evidence and material information in his possession contemporaneous with the filing of the Complaint, pursuant to 31 U.S.C.§ 3730(b)(2).  Relator complied with this provision by serving copies of this Complaint upon Jay E. Town, United States Attorney for the Northern District of Alabama, and upon the Honorable William P. Barr, Attorney General of the United States.  Relator previously provided substantially all material

2

evidence and information in his possession to the Office of the United States Attorney for the Northern District of Alabama.

7.      Relator is not aware that the allegations in this Complaint have been publicly disclosed.  To the extent Relator is aware of any public disclosures, this Complaint is not based on such public disclosures.  Relator is an "original source", having provided information voluntarily to the Government before filing this Complaint, and he has both direct and independent knowledge from any public disclosures that may exist; therefore, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4).

## **DEFENDANTS**

8.      Defendant Encompass Health Corporation was a for-profit healthcare corporation providing healthcare services throughout the United States. It was a successor company to HealthSouth Corporation which acquired Encompass Health Corporation in 2014, and rebranded HealthSouth as Encompass Health Corporation on January 2, 2018.  It was incorporated in Delaware and headquartered in Birmingham, Alabama. Encompass Health Corporation operated inpatient rehabilitation facilities throughout the state of Alabama, and throughout the United States, including Encompass Health Rehabilitation Hospital of Shelby County ("Encompass-Shelby") and Encompass Health Rehabilitation Hospital of Lakeshore ("Encompass-Lakeshore") (hereafter collectively "Encompass").  At times relevant to this litigation, claims were routinely prepared and submitted for reimbursement under Medicare and Medicaid (collectively "Federal Programs") under the provider names of HealthSouth Corporation before January 2, 2018, and Encompass on and after January 2, 2018.

9.     Encompass was the nation's largest owner/operator of for-profit inpatient rehabilitative facilities ("IRFs") operating a network of 133 IRFs in 33 states and Puerto Rico in 2019.  It had 23% of all licensed IRF beds in the United States, and served approximately 31% of all Medicare recipients receiving IRF services in the United States.  For 2019, Encompass IRFs generated $3,500,000,000.00, with a payor mix of 75.1% Medicare, 10.6% Medicare Advantage, and 2.8% Medicaid claims.  Encompass is traded on the New York Stock Exchange under the symbol EHC.

10.    Encompass is also the parent company to Encompass Home Health & Hospice ("EHHH"), the nation's fourth largest owner/operator of for-profit Medicare-certified home health services with 222 home health locations and 59 hospices in 31 states.

11.    Despite a $325 million FCA settlement in 2004 by HealthSouth, for billing group physical therapy as individual therapy, and a $48 million FCA settlement in 2019 by Encompass for billings false diagnoses, Encompass created a nationwide practice of knowingly submitting false Medicare and Medicaid claims to defraud Federal and State Payors on a massive scale in violation of the FCA.

12.    Defendant Robert Russell was the Chief Executive Officer for Encompass-Shelby ("CEO Russell") from April of 2018 to July 23, 2019.

13.    Defendant Michael Bartell was the Chief Executive Officer for Encompass-Lakeshore ("CEO Bartell") from July 1, 2018 to the present. He additionally served as Interim CEO at Encompass-Shelby from August 29, 2019 to September 30, 2019.

**RELATOR – PLAINTIFF**

14.     Jay Meythaler, M.D., J.D., ("Relator" or "Dr. Meythaler") was a citizen and resident of the United States and maintained his principal residence in Jefferson County, Alabama.  From April 11, 2018 until February 10, 2019, he served as Medical Director at Encompass-Shelby. From April 11, 2018 until his forced resignation September 26, 2019, he served as a credentialed rehabilitation physician on the medical staff of Encompass-Shelby.  He was board certified by the American Board of Medical Specialties in Physical Medicine and Rehabilitation with "special qualification" boards in Spinal Cord Medicine and in Brain Injury Medicine; as well as by the American Board of Neuromuscular & Electrodiagnostic Medicine.

15.     Relator reported fraudulent and unethical admission practices to Defendant CEO Russell, and other senior leaders at Encompass-Shelby, while he served as its Medical Director. On February 10, 2019, Defendants Encompass and CEO Russell retaliated by terminating Relator's Medical Directorship Contract.  Russell's successor, Defendant CEO Bartell continued to facilitate the fraudulent and unethical practices for Encompass including: 'doctor shopping' for Pre-Admission Screening ("PAS") approvals and the illegal practice of medicine by directing the admission and discharge of patients without a rehabilitation physician order.

16.     Defendant CEO Bartell complained about Relator to staff and sent verbal and written 'warnings' through Dr. Michael Rosemore, the Medical Director at Encompass-Lakeshore, that Relator should stop causing 'trouble'.  Due to deteriorating conditions within the hospital causing the inability to render a high quality of patient care and the ongoing retaliation by Encompass, Relator feared for his livelihood, and on September 9, 2019, notified Encompass he would leave the medical staff after his existing patients were discharged. The retaliation is more fully described in Count V herein.

5

## I.  GOVERNING LAWS, REGULATIONS

### A.  THE FALSE CLAIMS ACT

17.     The False Claims Acts of Federal and State Payors ("FCAs") are mechanisms by which the payors may police noncompliance with Medicare and Medicaid reimbursement standards post-payment. The FCAs prohibit knowingly presenting or causing to be presented a false or fraudulent claim for payment from the Federal and State Payors.  It is unlawful to conspire to defraud the Government by getting a false or fraudulent claim allowed or paid. 31 U.S.C. § 3728 *et. seq*.

18.     The Federal FCA, 31 U.S.C. at § 3729, provides in pertinent part that: (a) Any person who (1) "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; (2) "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim"; (3) "conspires to defraud the Government by getting a false or fraudulent claim paid or approve by the Government"; … or (4) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" was liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government. 31 U.S.C. § 3729(a) (1)(A), (B), (G).

19.     Significantly, the FCA imposed liability not only where a person had actual knowledge, but where the conduct was "in reckless disregard of the truth or falsity of the information." Further, "no proof of specific intent to defraud is required."  31 U.S.C. § 3729(b)(1).

20.    On May 20, 2009, Congress enacted the Fraud Enforcement and Recovery Act ("FERA"), which amended 31 U.S.C. § 3729(a)(1) and (a)(2), which became § 3729(a)(1)(A) an (a)(1)(B), respectively.  After the FERA amendments, § 3729 (a)(1) provided liability for any person who:

(A)    Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(C)     Conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or G).

§ 3729 (a)(1).

21.    The request for medical services reimbursement, which failed to meet regulatory criteria of enabling federal and state statutes, constituted a violation of the FCAs.  In this action, Defendants knowingly and routinely provided false certifications, by providing false information on Patient Assessment Instrument forms ("IRF-PAIs") for classes of patients falsely assigned to Impairment Group Code 03.9 for "other neurological", and ICD-10 codes for "brain injury" S06, "spinal cord injury" S14, S24, G95.2, M47, M48, M99; "spinal cord disease" G95.9, G95.2; "encephalopathy" G93.40, and "metabolic encephalopathy" G93.41, and other IGC and ICD codes, when no physician documentation supported those diagnoses.  Encompass also admitted and readmitted patients who did not qualify for Federal and/or State Payor funding, administered treatments to patients that did not qualify for Federal and/or State Payor funding, failed to provide the required therapies and falsified therapy documentation to qualify for Federal and/or State funding, held patients for excessive lengths of stay in violation of the Federal and/or State healthcare funded programs, and rendered care so grossly sub-standard as to result in patient harm and be 'worthless' under the FCA.

B.  FEDERAL GOVERNMENT-FUNDED HEALTH ASSISTANCE

     i.  MEDICARE AND MEDICAID PROGRAM REQUIREMENTS

22.     Medicare was a federal government-funded medical assistance program, primarily benefiting the elderly, created in 1965 when Congress enacted Title XVIII of the Social Security Act ("Title XVII"), 42 U.S.C. §1395 *et. seq.*  The Medicare program was administered by the Centers for Medicare and Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services ("HHS").  CMS operated locally through so-called Medicare Administrative Contractors ("MACs"), which processed claims from healthcare providers and made payment for eligible services.

23.     The Medicare program had four parts, two of which are relevant herein: Medicare Part A ("Hospital Insurance Program"), provided for care in the IRFs operated by Defendant Encompass. *See* 42 U.S.C. § 1395c, *et seq.*  Medicare Part B ("Supplemental Medical Insurance Program"), paid for physician services and a variety of outpatient services, such as therapy and rehabilitative care. *See* 42 U.S.C. § 1395j, *et seq.*

24.     To participate in the Medicare and Medicaid programs ("Federal Programs"), an institutional health care provider must meet the applicable qualifications and enroll in the Federal Programs. Defendant Encompass was a "Provider" under the regulations.

25.     The Medicaid Program provided health coverage to eligible low-income adults and elderly adults and was administered by Commonwealths and States in accordance with federal requirements.  The program was funded jointed by Commonwealths and States and the Federal Government.

26.     Under the Federal Programs, payments for services provided by IRFs to eligible patients were made by the Federal and/or State Governments prospectively based upon a formula that combined the patient's primary diagnosis, comorbidities, and functional level upon admission.   Using these three factors a government formula determined the patient's anticipated length of stay ("LOS" or "RAND") and payment.  Patients that failed to comply with the Medicare requirements during their stay were required to be discharged according to Chapter 1, Section 110 of the CMS Manual.  Due to the prospective payment system, or "pay for performance" system, IRFs were penalized if a patient was discharged before RAND to a skilled nursing home ("SNF").

27.     As a provider, Defendant Encompass was required to comply with the requirements of the Federal Programs in order to be eligible to receive payments for rehabilitative services.

ii.     THE IFR COMPLIANCE REQUIREMENTS THRESHOLD

28.     An IRF was a hospital designed to provide a patient with intensive rehabilitation therapy in a resource-intensive inpatient hospital environment for patients that, because of the complexity of their nursing, medical management, and rehabilitation needs, required and were reasonably expected to benefit from an inpatient stay and an interdisciplinary team approach to the delivery of rehabilitation care.  The goal of an IRF's intensive rehabilitation program was one-on-one therapies – physical, occupation, and speech - designed to improve a patient's independent functioning in the activities of daily living ("ADLs").

29.     In 2010, CMS implemented strict admission criteria which mandated that a patient require both hospital-level care and intensive rehabilitation for IRF admission. IRFs were not allowed to admit SNF or hospice level patients.

9

30.     Section 4421 of the Balanced Budget Act of 1997 (Public Law 105-33) authorized implementation of a prospective payment system ("IRF PPS") for IRFs. IRF-PPS reimbursement rates were approximately 2.5 times higher than acute care hospital rates.

31.     Typically, patients were admitted to an IRF following an acute-care hospitalization. Encompass received over 90% of its patients from acute-care hospital referrals. Admission criteria mandated that a patient require complex nursing, medical management, and rehabilitative needs; tolerate and benefit from therapy for 3 hours per day, 5 days a week; and have a planned discharge to 'home'. To assess whether a patient met criteria, the IRF was required to perform an independent preadmission "evaluation".

32.     To receive the higher IRF-PPS payment classification, IRFs were distinguished from general acute care hospitals by the requirement that at least 60 percent ("60% Rule) of its patients are discharged for specific "qualifying medical conditions". This was called the IRF "compliance threshold." The 13 "qualifying medical conditions", known as the CMS-13, were:

1.      Stroke
2.      Spinal cord injury
3.      Congenital deformity
4.      Amputation
5.      Major multiple trauma
6.      Fracture of femur
7.      Brain injury
8.      Neurological disorders including multiple sclerosis, motor neuron diseases, neuropathy, muscular dystrophy, Parkinson's disease, and 'other neurological'
9.      Burns
10.     Active polyarticular rheumatoid arthritis, psoriatic arthritis and seronegative arthropathies resulting in significant functional impairment of ambulation and other activities of daily living
11.     Systemic vasculitidies with joint inflammation resulting in significant functional impairment of ambulation and other activities of daily living
12.     Severe or advanced osteoarthritis (osteo-arthrosis or degenerative joint disease) involving two or more weight bearing joints (elbow, shoulders, hips,

or knees but not counting a joint with a prosthesis) with joint deformity and substantial loss of range of motion, atrophy of muscles surrounding the joint, significant functional impairment of ambulation and other activities of daily living

13.   Knee or hip joint replacement, or both, during an acute hospitalization immediately preceding the inpatient rehabilitation stay and also meets one or more of the following specific criteria:

-   Patient underwent bilateral knee or bilateral hip joint replacement surgery during the acute hospital admission immediately preceding the IRF admission
-   Patient is extremely obese with a Body Mass Index of at least 50 at the time of admission to the IRF
-   Patient is age 85 or older at the time of admission to the IRF.

42 C.F.R. § 412.29(b)(1)(iii)(2).

iii.   "MEDICAL NECESSITY" - Medicare Coverage Requirements

33.   Under the FCA's implementation regulations, a claim for IRF reimbursement had to conform to several requirements as 'conditions of payment.'  The care had to be "reasonable and necessary," and this required the reasonable expectation that the patient met all of the following:

a.   Patient required active and ongoing intervention of multiple therapy disciplines (physical therapy, occupational therapy, speech-language pathology, or prosthetics/orthotics therapy), one of which must be physical or occupational therapy;

b.   Patient required and could be reasonably expected to actively participate in, and benefit from, an intensive rehabilitation therapy program, generally consisting of –
i.   3 hours of intensive therapy 5 days per week; or
ii.   In certain well-documented cases, at least 15 hours of intensive rehabilitation therapy within a 7-consecutive day period, beginning with the date of admission;
iii.   Reasonable expectation that the patient could actively participate in, and benefit significantly from, the intensive rehabilitation therapy program (i.e. reasonable expectations for measurable improvement that will practically improve the patient's functional capacity or adaptation to impairments);

  c.  Patient was sufficiently stable at the time of admission to the IRF to be able to actively participate in the intensive rehabilitation therapy program that is described above;

  d.  Patient required physician supervision by a *rehabilitation physician*, defined as a licensed physician with specialized training and experience in inpatient rehabilitation. The requirement for medical supervision meant that the rehabilitation physician must conduct at least 3 face-to-face meetings to assess the patient's medical and functional levels per week, and modify the plan of care as needed; and

  e.  Weekly team meetings lead by the *rehabilitation physician* showed an intensive and coordinated interdisciplinary team approach to the delivery of the care.

42 C.F.R. § 412.622.

### iv. MEDICARE DOCUMENTATION REQUIREMENTS

34. Once an eligible patient was referred to the IRF, a comprehensive PAS would be conducted by a licensed or certified clinician, appropriately trained to assess the patient medically and functionally, within 48 hours before the IRF admission. 42 C.F.R. § 412.622(a)(4)(i)(A).

35. The PAS would include a detailed and comprehensive evaluation of the patient's present medical condition and history, with a preliminary diagnosis. The PAS documentation would then be reviewed by a *rehabilitation physician* to determine if the admission was "reasonable and necessary." This initial admission determination was based solely on the PAS documentation.

36. Within 24 hours <u>after</u> admission, 42 C.F.R. § 413.622(a)(4) required, as a condition of payment, that a *rehabilitation physician* examine the patient and complete a post-admission physician evaluation ("PAPE").  This exam served to:

- confirm the accuracy of the clinician's PAS documentation;

- determine if the PAS "preliminary diagnosis" was correct;
- assess the ability of the patient to tolerate intensive therapy;
- document the patient's admission status;
- identify any relevant changes since the PAS; and
- provide the basis for the rehabilitation physician to design the patient's individualized "overall plan of care."

37.     After the PAPE, if in the *rehabilitation physician*'s clinical judgment the patient was inappropriate for IRF services, the IRF was required to begin the discharge process *immediately*.  If the admission was inappropriate, after three days the IRF's reimbursement was reduced to the lower IPPS rate.  Similarly, if after admission it was determined that the patient could not tolerate, or refused to participate in 3 hours of daily therapy, the IRF was to discharge the patient and be paid at the lower IPPS rate.

38.     During the hospitalization, a *rehabilitation physician* was required to conduct at least three face-to-face visits each week to ensure that continued IRF care was appropriate and remained reasonable and necessary.  42 C.F.R. § 412.622(a)(3)(iv).

39.     The *rehabilitation physician*, with input from the interdisciplinary team of rehabilitation staff, was required to design and implement an interdisciplinary plan of care ("IPoC") within the first 4 days of admission. 42 C.F.R. § 412.622(a)(4)(iii).  The IPoCs were to demonstrate medical necessity by (1) detailing the intensity (hours per day), frequency (times per week), and duration (number of days) of physical, occupational and speech therapies required; (2) detailing functional outcomes; and (3) detailing the discharge destination.

40.     The therapies were to total 15 hours a week (3 hours per day for 5 days a week). The majority or "preponderance" of the visits were to be in the mode of one-on-one or individualized sessions – not group, concurrent, or co-treatment - conducted by a licensed therapist or a licensed therapy assistant under the therapist's direction.  Therapy was not to be

13

conducted by a therapy aide.  Therapy treatments had to begin within 36 hours of the midnight of the day of admission.  42 C.F.R. § 412.622(a)(3)(ii) and (iv).

41.     The rehabilitation physician led a weekly coordinated "team meeting" to keep updated on the patient's progress and to adjust the IPoC as needed. The interdisciplinary team members reported to the rehabilitation physician.

### v.     IRF PAYMENT PROCESS

42.     IRFs were paid under the authorized IRF-PPS *per-discharge* based on the *admitting* diagnosis provided by the IRF.

43.     The IRF submitted to the Government payor an IRF-Patient Assessment Instrument ("IRF-PAI") specifying an Impairment Group Code ("IGC") for the admitting condition which required rehabilitation. The IGC triggered assignment of a case mix group ("CMG").  Together the IGC and CMG determined the amount of reimbursement. The IGC assigned also determined whether the admission would qualify as CMS-13 compliant to meet the 60% Rule to retain IRF-PPS status for reimbursement purposes. 42 U.S.C. § 1395ww(j); 42 C.F.R. §§ 412.600 *et. seq.*

44.     IRF-PAIs were required to be submitted by Day 4 after admission. For IRFs that had patient populations of at least 50% Medicare FFS or MA patients, the MAC was permitted to rely on an automated CMS-13 compliance threshold review. Encompass patient population was 85% Medicare FFS and MA generating hundreds of thousands of paid claims without reviewing the medical documentation underpinning the IRF-PAI claims.

## II. ENCOMPASS' FRAUDULENT PRACTICES

45.     Encompass knowingly employed reckless business practices that enabled it to admit and receive reimbursement for patients who were ineligible for the IRF benefit. Encompass knowingly made or used false or fraudulent statements and schemes, or caused fraudulent statements to be made and unlawful schemes to be carried out, to obtain, or aid in obtaining, the payment and approval of false Medicare, CHAMPVA, TRICARE, Medicaid, F.A.M.I.S. and federal employee and veteran health program claims.   As a result of these reckless business practices and, false or fraudulent statements and schemes, Federal and State Payors paid hundreds of millions of dollars in claims to Encompass to which it was not entitled.

### A.  BACKGROUND

46.     Encompass-Shelby opened on April 10, 2018, under the leadership of Defendant CEO Russell.  It was a 34-bed facility located at 900 Oak Mountain Commons Lane, Pelham, Alabama. Relator, a board-certified rehabilitation physician, was recruited to move to serve as the first Medical Director.  Relator was credentialed at Encompass-Shelby to practice medicine as a 'rehabilitation physician'.

47.     Encompass-Lakeshore was a 100-bed facility located at 3800 Ridgeway Drive, Birmingham, Alabama. Defendant CEO Michael Bartell had served since July 1, 2018. Dr. Michael Rosemore ("Rosemore"), a family practitioner by education with some rehabilitation experience, had served as the Medical Director since 2014.  Rosemore was credentialed at Encompass-Shelby to practice medicine as an 'internist'.

48.     Encompass controlled the majority of IRF beds in Alabama, and based on information and belief operated all IRF beds located in Dothan, Gadsden, Montgomery, and Huntsville, Alabama.

15

49.     Encompass had IRF patient discharges of over 180,000 in 2018 and 186,800 in 2019, earning approximately $6.9 billion in revenue.  The average IRF payment per discharge was $20,315. Encompass payor mix was 73.5% Medicare, 9.8% Medicare Advantage, and 3.0% Medicaid in 2018 and 75.1% Medicare, 10.1% Medicare Advantage, and 2.8% Medicaid in 2019.

50.     Encompass policies, schemes, acts and omissions complained of herein were instituted by Encompass Corporate Headquarters and carried out on a national basis.

51.     From 2014 through 2016, the number of for profit IRF beds grew in the United States. The Government found there was adequate IRF bed capacity to exceed national demand. However, from 2016 to 2019 Encompass increased its bed capacity by 9% across the United States.  Obtaining patient admissions was highly competitive.  In 2016, the national occupancy rate was only 65%.  Encompass had an occupancy rate of 69.6% in 2018 and 72.3% in 3Q2019, exceeding the publicly reported national rates due to its aggressive business practices.

52.     Relator served as the first Medical Director and as the Chief of Staff for Encompass-Shelby from April 2018 to February 2019.  During Encompass-Shelby senior leader meetings, Defendant CEO Russell frequently emphasized to clinical staff the importance of meeting monthly patient quotas set by Encompass corporate to produce profitability for the location.

53.     During the initial 15 months in operation, Encompass-Shelby did not hit monthly quotas, and converted only 1 out of 2 potential referrals from acute care hospitals. The non-converted referrals either went home, entered a nursing home, or selected an IRF competitor. Defendant CEO Russell emphasized to Relator that fast approval of the potential patient's PAS -

16

within 20 minutes, regardless of their medical condition - was essential to avoid the loss of an admission.

54.     Between April 2018 and July 2019, Encompass-Shelby maintained an average patient census of 20-22 out of 34 beds, or a 58-64% occupancy rate. This was below Encompass' national occupancy rate of 69.5% in 2018. Defendant CEO Russell was terminated by Encompass Corporate Headquarters in July 2019 for failing to hit corporate financial targets.  In July 2019, Regional VP Brad Kennedy held a meeting at Encompass-Shelby and told senior leadership to 'fill every bed.'  After July 2019, census increased dramatically frequently hitting 100%.  This increase was achieved by inappropriate admissions involving unqualified and highly incentivized screeners assigning false CMS-13 preliminary diagnoses which went unchecked due to an unqualified Medical Director, and the void of a compliance program of utilization reviews and/or pre-claim or post-claim billing reviews.

55.     On August 29, 2019, Defendant CEO Bartell of Encompass-Lakeshore was formally named Acting CEO of Encompass-Shelby. Defendant CEO Bartell continued the corporate climate of pressured sales on screeners and "rubber stamping" by clinical staff to meet corporate quotas until his departure on September 30, 2019 when a new interim CEO was named.

    B.  ENCOMPASS MET PAYMENT CLASSIFICATION CRITERIA BY SUBMITTING
        FALSE CMS-13 DIAGNOSIS ON THE IRF-PAI

56.     As a condition of payment classification, Encompass-Shelby certified its threshold compliance in its 2018 cost reports.  Melanie Frazey, Encompass' National Director of Health Information Management, produced training materials that stated that the corporate "best practice' was to achieve 61% or greater. In 2018, Encompass-Shelby reported a 60.2%

17

compliance threshold. If Encompass-Shelby had failed to report at least 60%, it would have lost its IRF classification and its reimbursement from Government Payors would have been reduced to the much lower rate of a general acute care hospital.

57.    Encompass utilized a proprietary management system called BEACON to provide regional and local hospital management near real-time data to run the business. Volume metrics tracked admissions, discharges and daily census. Through BEACON it conducted daily monitoring of the CMS-13 admissions at each of its 133 locations. Through the use of this management tool it ensured that the IRF-PAI submissions provided CMS-13 compliant diagnoses to meet the 60% Rule through the manipulation of diagnoses.

58.    Across Encompass' 133 locations, the most frequently coded CMS-13 condition was "neurological."  In 2018 alone, the 'neurological' CMS-13 diagnosis accounted for 21% of Encompass' nationwide admissions.  During the first quarter of 2019, Encompass reported to investors that this increased to 22%.  These statistically high numbers, in comparison with other IRF providers, were obtained by routinely misclassifying the common non-CMS 13 diagnosis "debility," i.e. simply generalized weakness, to the CMS-13 diagnosis "neurological".  Prior to 2016, Encompass encouraged that 'debility' be changed to the CMS-13 diagnosis 'disuse myopathy.' This practice was stopped when Encompass learned of ongoing *qui tam* litigation being prosecuted by the Department of Justice and Encompass changed its "internal training" from using 'disuse myopathy' to emphasize the use of the "neurological" diagnosis. The HHS-OIG noted in its September of 2018. Report, A-01-15-00500, the increased and inappropriate use of 'debility' among a high percentage of IRFs audited, including many Encompass facilities.

59.    Encompass falsely completed IRF-PAI submissions with IGC 03.9 for "other neurological," and ICD-10 codes for "brain injury" S06, "spinal cord injury" S14, S24, G95.2,

M47, M48, M99; "spinal cord disease" G95.9, G95.2; "encephalopathy" G93.40, and "metabolic encephalopathy" G93.41, and other IGC and ICD codes, when the patient chart had no physician documentation to support any of those diagnoses.

60.     From February 2019 to the present, Encompass-Shelby admissions increased by 20-30%, where corporate-wide admissions only increased by 1-4% at various locations. Dr. Rosemore routinely approved patients admitted under the CMS-13 diagnoses of "neurologic", "other neurologic", and "metabolic encephalopathy" without any clinical documentation or cognitive assessments to support the CMS-13 diagnosis. Relator was assigned the care for many of these patients after Dr. Rosemore approved the admission, and upon examination and treatment of the patients, found no support for the CMS-13 diagnoses.

61.     During the 2018 cost reporting period for Encompass-Shelby, approximately 130 PASs were submitted by screeners with "neurological conditions" as the preliminary CMS-13 diagnosis.  Relator conducted an audit of these 130 PASs and found that the screeners' preliminary diagnosis of "neurological conditions" was not supported by documentation and was false in 27% of the PASs. Based on information and belief, Encompass corrected less than half of these false diagnoses on its IRF-PAI submission.  If truthful information had been presented to Government Payors, it would have dropped the compliance threshold below 60% causing Encompass-Shelby to loss its IRF payment classification. Encompass-Shelby received approximately $20,000,000 in reimbursement during the 8 months of operation in 2018. This fraud has continued through the present.  The estimated overcharge to Federal and State Payors in 2018 exceeds $12,000,000, and is projected in 2019 to exceed $21,000,000, for a total of $33,000,000 in just the 17 months of operation at a single location.

62.     Based on information and belief, the same fraud has occurred, and is ongoing, at Encompass-Lakeshore under the leadership of Defendant CEO Bartell.  Bartell has used many of the unqualified screeners from Encompass-Shelby and has Dr. Rosemore as Medical Director approving PASs not supported by his PAPEs clinical documentation. Encompass-Lakeshore facility is 3 times the size of the facility at Encompass-Shelby and has hundreds of millions in annual false billings using the same fraudulent business practices and schemes described herein.

63.     In 2018, Encompass reported $2.6 billion in revenue from its 76.5% Medicare/Medicaid payor mix. In 2019, Encompass' Medicare/Medicaid payor mix rose to 77.9% for an increase in revenue to $2.7 billion from Government Payors. Encompass reported a corporate-wide compliance threshold of 60.1% with the CMS-13 diagnosis "neurological" accounting for 21% of its admissions.  Based on information and belief, various "neurological" related diagnoses were used to inflate more than 0.1% of admissions to maintain IRF payment classification.   Truthful reporting would have changed the IRF-PPS classification to IPPS nationally resulting in an estimated corporate overpayment of over $3.3 billion in 2018 and 2019 alone.

64.     In the first and second quarters of 2019, Encompass reported corporate-wide that the CMS-13 diagnosis "neurological conditions" accounted for more than 21.5% of all admissions, and its use had increase over 2018. Based on information and belief, Encompass continued to falsify and inflate certain CMS-13 diagnoses to retain IRF-PPS reimbursement.

65.     Encompass-Shelby coders submitted false IRF-PAI forms for payment reimbursement. The coders had access to the patient's electronic health record which reflected the Relator's documented non-CMS-13 diagnosis and the screener's CMS-13 PAS preliminary diagnosis.   Where Relator's diagnosis would negatively impact Encompass-Shelby's 60%

compliance threshold, coders would intentionally submit the false screener's CMS-13 diagnosis

to ensure Encompass qualified for IRF-PPS reimbursement. Examples include:

| Record # | PAS Date | False Preliminary Diagnosis By Screener Submitted by Coder | Actual Documented Diagnosis By Physician Available to Coder for Submission |
|---|---|---|---|
| #500504 | 11/7/18 | Neurological | Debility |
| #500535 | 11/16/18 | Brain Injury SDH with fall from debility | Resolved concussion/ Debility |
| #500199 | 11/26/18 | Neurological | Thoracic spinal fracture |
| #500578 | 12/04/2018 | Spinal Cord Injury | Debility |
| #500955 | 2/14/19 | Brain Injury Encephalopathy | Debility |
| #500953 | 3/26/19 | Brain Injury Hepatic Encephalopathy | Debility |
| #500931 | 3/25/19 | Spinal Cord Injury | Discitis no neurological deficits |
| #500898 | 3/8/19 | Spinal Cord Injury | T6 compression fracture no neurological deficit |
| #500958 | 4/11/19 | Brain Injury Encephalopathy | Debility |
| #501003 | 4/10/19 | Brain Injury Encephalopathy? | Debility |
| #500960 | 4/2/19 | Neurological Encephalopathy/ Anoxic | Debility |
| #501177 | 6/5/2019 | Spinal Cord Injury | Cervical Fracture C6, no spinal cord injury |
| #501159 | 5/24/19 | Neurological | Debility |
| #501158 | 5/29/19 | Neurological | Debility May Thurner syndrome with pain left leg |
| #501079 | 5/30/19 | Neurological | Debility from Chemotherapy |
| #501222 | 6/17/19 | Brain Injury Meningioma resection | Debility Developmental Delay Childhood |
| #501218 | 6/14/19 | Neurological | Medical Debility Severe Diabetic peripheral neuropathy |
| #500896 | 7/16/19 | Neurological | Diabetic Neuropathy Mild tremors |
| #501293 | 7/13/19 | Brain Injury Metabolic | Debility Mild memory losses |

| | | Encephalopathy | |
|---|---|---|---|
| #501265 | 7/1/19 | Neurological | Healing Hip fracture<br>Medical Debility<br>Dementia (premorbid) |
| #501329 | 7/18/19 | Brain Injury | ICH<br>Minimal cognitive issues<br>No focal motor |

C. ENCOMPASS-SHELBY DELAYED PATIENT DISCHARGES TO AVOID FEDERAL AND/OR STATE PAYOR PAYMENT PENALTY AND MAXIMIZE REIMBURSEMENT

66.    Encompass-Shelby faced scrutiny and pressure to hold patients, who should have been discharged to nursing homes/SNFs, through their full LOS/RAND even if the patient was not meeting CMS criteria. Medicare Benefits Policy, Transmittal 119, Chapter 1, Section 110.2.

67.    Encompass-Shelby management routinely instructed staff to keep patients through their RAND to avoid a payment penalty from Medicare, or being forced to return payments received through the PPS system.

68.    From April 2018 through Relator's resignation, many therapists complained that Encompass-Shelby routinely admitted patients that could not meet therapy criterion for IRF admission. Many patients could not tolerate the therapies, refused to participate, or simply could not be improved by the therapies. These concerns were shared with senior leadership with the response by Encompass being lectures that it was the therapists' job to "stay positive", and be a team player, no matter how difficult a case might be.  Over 50% of the therapists quit Encompass-Shelby in its first year of operation, citing the pressure of management to produce improvement in patients with no chance for realistic improvement and working with inadequate therapy staff.

69.    Case managers also received pressure from management to delay Functional Independence Measure ("FIM") assessments, SNF placement, and discharge dates to maximize

22

the length of stay and payment to Encompass.  Unlike an acute care hospital, where a physician orders a patient discharged and the process begins, in an IRF, the physician recommends discharge and the timing is dependent upon planning and execution by the Case Management Department. For example, Relator recalled situations where a patient expressed, early on, a desire to be discharged to a SNF.  Case Managers were aware as they participated in weekly team meetings. Even when Relator would recommend discharge to a SNF, Case Management would delay the discharge planning to extend the patient's stay to the maximum RAND to obtain higher reimbursement. Encompass-Shelby had a pattern and practice of delaying discharge planning to reach RAND and maximize reimbursement.  Encompass-Shelby also had a pattern and practice of pushing patients to a 'home' discharge with Encompass Home Health even when patients requested to go to SNF, because a discharge to SNF penalized Encompass. In addition, when Case Management recommended home health follow up care, it provided an additional revenue stream to Encompass.  Relator observed that Case Management would recommend home health follow up even when the physician had not ordered home health follow up care.

70.    Relator does not recall any discharge from Encompass-Shelby to a SNF before the end of the patient's Functional Related Group length of stay.  All patients were held to maximum reimbursement.  In some cases, patients came from the SNFs to Encompass, only to be sent back to the SNFs with no improvement, causing an unnecessary expenditure of Medicare dollars.

71.    Among the hundreds of patients that were improperly held until their LOS/RAND was exhausted are the following examples:

- Medical Record #501187 – 6/7/19 – Patient was post-stroke showing no progress. The family, Dr. Meythaler, and the interdisciplinary team all agreed discharge to a SNF was appropriate. Case Management disagreed and said "let's give her another week or two then move her". The patient was held for 14 more days to reach maximum reimbursement.

- Medical Record #501329 – 7/19/19 - Patient admitted with traumatic brain injury. Relator examined him on 7/20/19 and advised he could go home quickly due to his good functional capacity.  Case Management refused to discharge.  Dr. Meythaler reiterated his discharge recommendation at the weekly team meeting on 7/23/19. Case Manager Beth Eades stated Blue Cross Blue Shield of Alabama had approved a 7 day stay, so he would be held that long.  Patient was discharged on 7/27/19 with the same independent functioning condition with which he had been admitted.

- Medical Record #501329 – 7/19/19 – Patient admitted with Moderate TBI – traumatic brain injury – and ICH – intracerebral hemorrhage. He was mobile with a clear mind and could perform all ADLs.  Discharge was recommended.  Case Manager Beth Eades said "they (Case Management) need time to develop a discharge plan" so discharge was delayed.

- Medical Record #501218 – 6/15/19 – Patient was admitted with medical debility, severe diabetic peripheral neuropathy (a non-CMS 13 diagnosis). Encompass coders submitted an IRF-PAI with a diagnosis of "neurological" which is CMS-13 compliant.

- Medical Record # 500952 – 4/18/19 – Relator recommended discharge to a SNF for this re-admission due to no potential for rehabilitation.   Therapy agreed. Case Management held discharge until 5/10/19.

- Medical Record #501061 – 4/25/19 –Dr. Rosemore approved a PAS for patient with the diagnosis of alcoholism. Patient immediately refused any therapy, and his family wanted him to enter a SNF. Case Management transferred to a SNF on 5/3/19 after Encompass-Shelby had received full reimbursement.

- Medical Record #500750 – 9/4/19 – Patient had a Pons stroke. It was documented in weekly team conference on 9/4/19 that she was not progressing, would not return home, and placement in a SNF should be planned. This was repeated and documented on 9/10/19 by Relator. Case Management advised it would not discharge until 9/17/19 to get full reimbursement in spite of the fact the patient was making no progress.

D.  ENCOMPASS-SHELBY CODERS FRAUDULENTLY ALTERED DIAGNOSIS TO AVOID PAYMENT PENALTIES

72.    IRF-PAIs were monitored daily through BEACON to for readmissions. A patient's readmission within 90 days for the same diagnosis would result in a payment penalty. So coders sometimes disregard both the screeners' preliminary diagnosis on the PASs and the

physicians' diagnosis and selected a diagnosis for submission on the IRF-PAI to the Government

Payors.  Examples of this common business practice and pattern are reflected in this chart:

| Record # | PAS Date | Documented False Screener Diagnosis | Actual Documented Physician Diagnosis | Diagnosis Submitted by Coder on IRF-PAI |
|---|---|---|---|---|
| #500508 | 11/11/18 | Neurological | Debility | Cardiac |
| #500114 | 11/18/18 | Spinal Cord Injury | Spinal fractures/No neurological | Orthopedic/Other |
| #500616 | 12/12/18 | Neurological | Debility Mild Cognitive issues | Other |
| #500691 | 1/9/19 | Neurological Encephalopathy? | Severe debility Diabetic neuropathy | Other |
| #500720 | 1/1519 | Neurological Encephalopathy | Debility | Pulmonary |
| #500750 | 1/23/19 | Spinal Cord Injury | C1 Fracture no Neurologic deficits Debility | Other |
| #500691 | 1/11/19 | Neurological | Debility | Other |
| #500222 | 2/5/19 | Neurological Hepatic encephalopathy | Complex Medical Debility | Other |
|  | 6/27/19 | Hepatic encephalopathy | Hepatic encephalopathy | Brain Injury |
|  | 5/17/19 | Other orthopedic | Humerus Fracture | Orthopedic other |
|  | 5/30/19 | Other  Other Hepatic encephalopathy | Humerus fracture | Orthopedic-Other |
|  | 7/30/18 |  | Debility | Other |
| #500790 | 2/20/19 | Neurological | Medical Debility | Cardiac |
| #500836 | 2/23/19 | Spinal Cord Injury | Lumbar fracture No Neurological | Orthopedic |
| #500929 | 3/20/19 | Neurological Encephalopathy | Debility | Cardiac |
| #501019 | 4/13/19 | Neurological Myopathy | Medical Debility | Cardiac |
| #501148 | 5/22/19 | Spinal Cord Injury | No neurological noted from spine | Orthopedic |

| #500702 | 5/30/19 | Neurological Diabetic Amyotrophy | Diabetic amyotrophy | Other |
| | 1/10/19 | Brain Injury | Myelopathy not specified/diabetic amyotrophy | Spinal Cord Injury |
| #501272 | 7/2/19 | Neurological | Debility with mild cognitive issues | Pulmonary |
| #501278 | 7/10/19 | Neurological | Debility | Other |
| #501297 | 7/8/19 | Brain Injury Encephalopathy | Dementia Parkinson's symptoms Old CVA Failure to thrive | Other |
| #501284 | 7/25/19 | Spinal Cord Injury | Debility with L1 lytic fracture | Orthopedic other |

73.     Government Payors do not reimburse an IRF for a readmission for the same diagnosis within a 90-day period.  Encompass-Shelby coders would monitor readmissions and submit undocumented diagnosis on the IRF-PAI to ensure payment.  For example:

- Patient #500075 was admitted on 5 occasions within a 12-month period. The screener's CMS-13 'preliminary diagnoses' were neuropathy and metabolic encephalopathy on each of the 5 hospitalizations. On each hospitalization the Relator diagnosed the non-CMS-13 diagnosis of complex medical debility. Encompass-Shelby coders ignored this information in the EHR and submitted IRF-PAIs reflecting the following diagnoses for these 5 hospitalizations:

    | Medical Record # 50075 | 5/15/18 | Orthopedic |
    | | 10/23/18 | Orthopedic |
    | | 2/06/19 | Pulmonary |
    | | 3/18/19 | Cardiac |
    | | 5/15/19 | Pulmonary |

- Patient #500622 was admitted on 2 occasions with the CMS-13 'preliminary diagnoses' of brain injury and encephalopathy.  Relator diagnosed the non-CMS-13 diagnosis of debility.  Encompass-Shelby coders submitted the false diagnosis of "brain injury" on the 12/17/18 admission, and manipulated a new false diagnosis of neurological on the 1/22/19 re-admission.

26

E. ENCOMPASS-SHELBY RENDERED SUCH GROSSLY SUBSTANDARD IRF SERVICES AS TO BE 'WORTHLESS' IN VIOLATION OF THE FCA

74.    Encompass-Shelby received an aged patient population with multiple, often complex medical management issues. The average Medicare patient was 76 years old, and Medicare accounted for 75.1% of admissions in 2019. It marketed "superior outcomes" with "rehabilitative nurses" providing specialized care. It marketed functional improvement with the assistance of its physical, occupational, and speech therapists.  It marketed dietary and nutritional counselors that would provide proper nutrition during the patient's hospitalization.

75.    Encompass investor materials touted its value and position as the industries' "low cost leader," with costs 11.6% lower than competitors due to market density and operational efficiencies. Encompass stated that it had 'caretaker optimization', a culture of 'employee excellence', and 'daily monitoring of productivity.' Encompass' average revenue per visit was 3.5% higher than its 'public peer average' (other publicly traded providers). It emphasized 'cost effectiveness' driven by 'labor management,' With a focus on lowering its largest expense – employee payroll. Relator observed that the 'labor management' included understaffing of nursing, dietary, therapy and pharmacy staff.  The average payment for a patient admission was $20,315, while the costs were $13,622.

76.    Encompass-Shelby cut costs by not employing any nurses with rehabilitative experience and no R.N. with the specialized training and certifications as 'rehabilitative nurses.' Relator observed that due to the understaffing and lack of rehabilitative nursing training, the majority of nurses were overwhelmed by the ratio of nurses/patients. These factors, and the work environment at Encompass-Shelby, contributed to the 95% turnover in nursing staff during 2018, and an overall turnover in all staffing of 50% since the IRF opened in April 2018.

77.     While serving as Medical Director, nurses brought concerns to Relator which included having no Chief Nursing Officer for months, no Infection Control nurse, no nurse educator, and the fact that often the night Charge Nurse was an LPN, rather than a RN. All of these were violations of The Joint Commission on the Accreditation of Hospitals.

78.     After Relator's termination as Medical Director in February 2019, there was no oversight of a rehabilitation physician as Medical Director – as required by Medicare as a condition of payment – and conditions deteriorated and patient transfers to acute care hospitals dramatically increased.

79.     Relator experienced repeated instances where Encompass-Shelby failed to (1) administer medications as prescribed, (2) provide standard infection control resulting in urinary tract and wound infections, (3) attend to the basic nutrition and hygiene requirements of residents, (4) perform laboratory testing as ordered, (5) have necessary equipment to provide the minimum quality of care required, (6) have medications, formulas and supplements listed on the hospital formulary and would 'substitute' without notice to the physician, (7) have life-saving drugs readily available in the event of a cardiac arrest, and (8) have weekend staffing of the pharmacy. These deficiencies caused Encompass-Shelby to fail to meet the minimum statutory standard before filing a claim for reimbursement.

80.     Relator spoke with the Southern District's Regional Chief Nursing Officer, Billy Kinsel, about the lack of skilled nursing staff, and the high nurse-patient ratios resulting in poor patient care as described above. Kinsel responded that Encompass would hire a 'floor secretary' to start in September 2019 to help handle physician orders.

81.     Encompass-Shelby also lacked <u>any</u> nurse on staff certified in Advanced Cardiovascular Life Saving, so no drugs to treat a cardiac arrest could be kept on the "crash cart."  From April 2018 to at least October of 2019 when Relator resigned, medications for a cardiac arrest were held in the pharmacy. In the event of a heart attack, a physician would get the required medications from the pharmacy and administer. It caused an unavoidable time delay that should not have existed.  In July 2019, Encompass made an additional cost-saving move and eliminated weekend pharmacy staffing. Then, in the event of a weekend heart attack, Encompass-Shelby -- an IRF hospital – would call 911 for a fire department EMT to respond to resuscitate a patient.

82.     On July 26, 2019, the Encompass Regional Director of Pharmacy told Encompass-Shelby Pharmacist, Anna Pate Vanderbleek, that all weekend pharmacy coverage was transferred to Telehealth Cardinal Health Pharmacy.  The Regional Director, Alisa Chamblee said that Encompass-Shelby's size (34 beds) did not financially justify having pharmacists on staff at nights or on the weekends.  Vanderbleek advised this was "blatantly unsafe" and something that a nursing home can do, but not a hospital.  The Regional Director of Pharmacy warned her, "never say that again."

83.     Telehealth pharmacy worked by the local nurse calling out to the Cardinal Health out-of-state entity, requesting a medication, and then Cardinal Health electronically unlocking a drawer at the Encompass-Shelby facility where the medication was stored.  If the medication needed was not stocked, there was no means to get the medication.  If the prescription printer malfunctioned, or ran out of paper, there was no way to unlock the printer to use it on weekends.

84.     Encompass-Shelby also lacked a minimally sufficient dietary department.  It could not even provide the common 'low sodium diet.'  It listed tube feeding formulas and

supplements on its formulary which in fact were not available, without informing physicians who were ordering the formulas.  Beginning late August 2019, the sole nutritionist was reduced to part-time, which further challenged proper nutritional planning and consultations to very sick patients.

85.     The Central Supply Department was an important hospital department which issued sterile supplies and most of the special equipment needed in the care of patients. In July 2019, in another cost-saving measure, operation of the Central Supply Department of Encompass-Shelby was assigned to Misty Tupinax, Defendant CEO Russell's personal administrative assistant.  Tupinax had no experience in running a Central Supply Department.

86.     Encompass-Shelby admitted a patient with a tracheostomy when the hospital had no equipment to change the tube if it occluded, and no respiratory therapist on duty to assist in the event of a problem.

87.     Encompass-Shelby went months without having Point of Care INR (International Normalized Ratio) equipment, i.e. a small hand-held device to finger prick and test blood. Encompass-Shelby's equipment was recalled between October 2018 and January 2019, and it did not replace equipment until May 2019. This followed an incident that lead to a patient being immediately transferred to an acute-care hospital.  The nursing staff frequently failed to collect blood work as ordered, and when they did, it had to go out to a laboratory which took days for the results to be provided to the physician.  Blood testing strips could have corrected the issue as early as January 2019, but, as a cost-savings measure, the hospital did not purchase until May 2019.

88.     Encompass-Shelby lacked sufficient medical staffing.  It had no medical specialist on staff except cardiology, and nephrology [which only followed dialysis patients and provided no consultations] and the latter only followed dialysis patients and did no other consults.  Often psychiatric evaluations were needed for the patient population and this resulted in transfers to acute care emergency rooms.

89.     Since February 2019, Encompass-Shelby has had no medical director who was qualified or privileged as a rehabilitation physician to serve as medical director as required as a condition of payment.  Examples of issues which occurred, as a result of these conditions, included:

- Medical Record #501322 – 7/27/19 - Relator ordered daily thoracic wound care.  It was not provided for 10 days – from 7/18-7/27/19 - and the wound became necrotic and required debridement.

- Medical Record #500320 – 8/29/18 - Relator declined to admit a patient with metastatic lung cancer to the neck who had a #4 tracheostomy because Encompass-Shelby did not have tracheostomy supplies to care for the patient. Defendant CEO Russell directed Relator to approve the admission and promised supplies would be available. Patient was admitted at 9 p.m. with no respiratory therapist on duty and no #4 tracheostomy supplies, so Relator remained at the hospital late into the evening in case the tube occluded.  Five days later (9/2/2018) the tracheostomy was blocked and Relator had to emergently use a #6 tube so the patient could breath.  Encompass-Shelby still did not have the proper size tubing.

- Patient Whittle – 4/5/19 –Relator ordered blood tests to confirm the diagnosis of encephalitis so he could develop an IPoC. After 5 days the blood test had not been performed.

- Medical Record #501272 – 7/3/19 – Screener told an acute-care hospital that Encompass-Shelby could care for the patient and provide magnesium intravenously ("IV"). Relator reviewed the PAS and recommended the patient remain at the acute-care hospital. The screener insisted on transfer. Upon arrival nursing staff could not start the IV so the medicine was delayed, and in less than 48 hours the patient had to be transfer back to acute-care.

- Medical Record #501344 – 7/22/19 – Relator ordered timed voiding with post-void urine output monitoring, but the nurses did not follow the orders. After the patient

31

complained of extreme pain, Relator ordered a bladder ultrasound which showed 547 cc of urine. Relator ordered the patient to be catheterized and transferred to UAB. The nurses did not catheterize. RL6-311733 (RL numbers indicate an incident report filed by Relator).

- Medical Record #500896 – 7/20/19 – Relator ordered urine output monitoring, but the nurses did not follow the order. Patient was diabetic and Relator ordered Glucerna supplement from hospital formulary. Relator later learned the only hospital stocked supplement was Ensure, which is not always tolerated by diabetics.

- Medical Record #501321 – 7/23/19 – Patient had pelvic fracture and Relator ordered pain medication "as needed." Nurses failed to provide the pain medication on multiple occasions so the patient quit the required physical therapy. RL6-311784.

- Medical Record #501321 – Relator ordered oxygen via BiPaP machine. Encompass-Shelby informed Relator it only 'rented' BiPaP machines and it had none, so the patient had to be transferred back to acute care hospital for cardiopulmonary problems.

- Medical Record #501385 – 8/10/19 – The respiratory therapist forgot to restart the patient's oxygen which led to pulmonary regression and a transfer back into the acute care hospital. The family discovered the oxygen turned off when they visited the patient. RL6-315654.

- Medical Record #500915 – From 7/30 – 8/13/19, this dementia patient had 5 recorded falls.

- Medical Record #500406 – Patient entered with a gastrostomy tube but the nurses did not perform a swallowing evaluation. Relator ordered the patient to receive tube feedings and nothing by mouth. Dietary delivered a food tray to the room. RL6-316242.

- Medical Record #501433 – 8/20/19 – Patient ordered to have timed urine output every 4 hours, but the nurses did not follow the order. The patient's bladder distended twice in a 7-hour timeframe which resulted in Relator's clinical finding of bladder damage due to over distention. RL6-316878.

- Medical Record #501420 – 8/20/19 – Relator found this patient sitting in excrement with a towel stuffed in diaper. RL6-316914.

- Medical Record #501344 – 8/15/19 – Relator found this patient sitting in excrement with a towel stuffed in diaper.

- Medical Record #501481 – On 9/12/19, Patient was discharged to hospice. The family asked for paper prescriptions. On 9/13/19, the family called Relator asking why he not had received all his medications. On investigation the prescriptions were

found on the floor in discharge materials that should have been provided the patient at discharge. The patient had failed to receive as least 12 prescriptions, including medication for seizures and brain swelling because of her brain cancer.

- Medical Record #501471 – Relator gave written and oral orders for daily abdominal wound care, with pictures to be taken and charted. On 9/13/19, after 3 days, Relator discovered no wound care had been performed.

- Medical Record #501490 – Patient was not provided medication to prevent a recurrent stroke as ordered. On 9/13/19, Relator found that no nurse had visited the patient as of 10 a.m.

F. ENCOMPASS-SHELBY SCREENERS DOCUMENTED FRAUDULENT 'FUNCTIONS AND GOALS' TO JUSTIFY ADMISSIONS FOR MEDICAL NECESSITY'

90. In order to qualify for IRF hospitalization a patient must be able to tolerate 3 hours of therapy for 5 days (15 hours of therapy a week) and the expectation that based on their medical condition there can be functional improvement through physical, occupational and/or speech therapy. So key medical information was gathered on any potential admission referral by an Encompass 'screener' on a PAS form. That form was then reviewed by the Relator/Medical Director and if it supported 'medical necessity' he would 'concur' and the patient was approved for admission.

91. Encompass, aware that the PAS had to provide a medical condition and specific functional capabilities for a patient to meet 'medical necessity' for admission, deployed its Advancing Clinical Excellence through Information Technology ("ACE IT") clinical information system in 2014 with a PAS designed to aid screeners and decrease loss/declined referrals. The PAS was engineered for quick completion using drop-down menu option documentation that would support medical necessity *if it truly represented the patient's condition*.

92.     Encompass received 90% of its referrals from acute-care hospitals via an ACE IT electronic referral routed to the "Admission Liaisons" and the "Rehabilitation Liaisons. Encompass corporate procedures stated that the "Admission Liaison" was responsible for coordinating the referral, insurance verification, and preadmission documentation.  They were located in the Hospital Administration Department. and required clinician credentials of a Registered Nurse ("RN"), Physical Therapist ("PT"), or Occupational Therapist ("OP").

93.     Encompass corporate procedures stated that the "Rehabilitation Liaison" was responsible for completing the preadmission screening ("PAS") documentation. The Rehabilitation Liaisons were the "screeners" and located in the Marketing Department. National Encompass job postings required background as a "licensed and certified clinicians (Registered Nurse, Therapist) or healthcare sales."  Job responsibilities included: "developing census as defined in target goals of the business plan and building referral relationships within the geographic territory;" coordinating the "referral to admission conversion process;" and completing the preadmission screening form to determine if the "conditions of admission" are met.  The job as described listed no specific clinical training or experience.  Encompass ignored CMS regulations that required only licensed and certified clinicians to serve as screeners.

94.     As Medical Director Relator was responsible for reviewing every PAS, and depended on the information provided by the screeners to be truthful in order to determine medical necessity for admission.  Relator paid special attention to the PASs' "function and goals" sections to access whether, in his clinical judgement, the potential patient would tolerate and benefit from the required 15 hours/week of intensive therapy. Encompass training materials used during his orientation stated the PASs were completed by nurses.  After months of approving admissions based on the PAS information, only to find after performing physical

examinations of those patients that the PAS documentation was inaccurate, Relator began to question the PAS process and screeners' education/training. Frequently had truthful "function and goals" information been provided on the PASs, he would not have concurred with the initial decision to admit the patient.  Frequently after examination he documented that the patient should be discharged immediately as IRF hospitalization was inappropriate.

95.     Relator, as part of his Medical Director duties and responsibilities, made inquiries into the process and screeners' education and clinical backgrounds. He learned that Encompass policy allotted the screeners only 45 minutes, from receipt of referral, to complete the PAS. In that 45-minute time window the screener was to 1) travel or contact the hospital for the patient's medical record to review and ideally speak with the patient, 2) perform an independent physical evaluation of a patient or his records, and 3) complete the 12-page electronic form. Encompass' policies labeled an admission as a 'win' or 'sale'.  These times were tracked by Encompass management software and compliance and productivity was tracked and shared with employees.

96.     Due to time corporate pressure to 'win' referrals the speed of completing PASs was achieved as Encompass screeners resorted to relying on reports from the acute care hospital nurses attending the patient and reviewing the chart, where available.  Screeners often had no contact with the patient or the patient's family. Screeners' notes frequently reflected this process when they wrote 'per nurse' on their entries in the PAS.

97.     Relator saw a pattern of identical documentation of hundreds of PAS forms. After examination of the patient, he often found the documentation was wrong and that no screener had ever meet with the patient or patient's family. Relator recalled his Encompass corporate training on the ACE IT electronic health record when he had asked how clinical staff would enter information not found in a drop-down option. The corporate trainer had advised

Relator to "pick an option" because options were designed to ensure compliance with Federal Regulations. He cautioned Relator not to enter information because "that's what leads to denials".

98.     Relator questioned the training/education of the 'nurse screeners' due to the inaccurate information he received on hundreds of PAS. He observed that RNs who were signing PASs never left the IRF. That is when Relator learned that many screeners were non-licensed and non-certified clinicians.  Those unqualified screeners were completing the PAS as a 'data collector' and then the RNs would sign the PAS in the ACT IT field called Designated Clinical Screener ("DCS"). The pre-populated documentation was a tool that greatly benefitted Encompass and its use of unlicensed and uncertified clinicians as screeners. This deceptive business pattern exists throughout Encompass corporate network. Examples from Encompass-Shelby would include every PAS completed by these named screeners:

- Medical Record #500504 – Screener Pontarelli
- Medical Record #500526 – Screener Harrison
- Medical Record #500727 – Screener Boyd
- Medical Record #501276 – Screener Pnazek

99.     Encompass incentivized screeners with a bonus of up to $2,000 per time period. Relator was told by a screener that bonuses could exceed one-third of base salary; however, if a screener did not meet corporate quotas, their base salary was reduced.  Bonuses were also paid even when an admission was later determined inappropriate and an early discharge was required. Encompass tracked screeners, for bonus credit purposes, through a "referral credit" field on the electronic PAS form.  Analysis of PAS forms by non-qualified screeners, i.e. 'data collectors' showed they were designated to receive the bonus credit.

100.    As Encompass corporate increased pressure to meet monthly quotas at this new Encompass-Shelby location, Relator was directed by CEO Defendant Russell to complete the admission within 20 minutes of receiving the completed PAS.  He was told to prioritize this function 24/7, and to place it over patient care.  Specifically, he was hold to halt his patient rounds when a PAS was sent for review.

101.    Encompass' electronic PAS form only permitted the reviewing rehabilitation physician 2 options: 1) "concur," which admitted the patient, or 2) "other." There was no ACE IT option to select when a physician's clinical judgement found an admission inappropriate except "other". When Relator selected 'other' it sent an electronic alert to the Admission Liaison Department and Defendant CEO Russell. Early on, when Relator selected 'other' and documented that an admission was inappropriate, senior leadership and/or Defendant CEO Russell would track him down in the hospital and push him to admit the patient.

102.    Relator would require additional documentation before he would 'concur'. Initially senior leadership complied with the request.  But as the number of requests increased, complaints were made to Defendant CEO Russell that Relator was slowing the process and causing "too much extra work." Defendant CEO Russell met with Relator and urged him to approve admissions without requiring additional documentation. Relator refused to automatically 'rubber stamp' every PAS for admission, and he was chastised by Encompass-Shelby senior leaders and Defendant CEO Russell for not being "positive enough" and not being a "team player."  This was a common tactic used by Encompass to force employees to play along or quit. Encompass' corporate training materials on the PAS process stated the CEO's role was to "constantly remind all of the above (liaison, physician, coder, PAS Coordinator) that we are all on the same team."

103.    Finally, Relator's requests for additional clinical documentation went unanswered n multiple occasions when Relator refused to 'concur', Defendant CEO Russell directed the Admission Liaison Department to begin processing the admission before there was a physician order.   Then Russell would seek a 'second review' from Dr. Rosemore to get the PAS concurrence. Dr. Rosemore, with only one exception, admitted every patient Relator declined to admit without ever consulting the Relator to discuss the matter.  The 'second review' noted in the medical charts was never at the request of Relator, a physician, and the only appropriate person to seek a 'second review' as it considered the practice of medicine.  It was merely a technical mechanism to 'hide' Relator's denials in the ACE IT system and to obtain the 'rubber stamp' from Dr. Rosemore.

104.    Post-admission Relator examined patients and often recommended immediate discharge because the 'functions and goals' documentation was false; the patient refused to participate in therapy or was too debilitated to participate in therapy; and/or the patient stated they intended to be discharged to hospice and/or a nursing home.  Patients were readmitted to Encompass-Shelby for therapy despite having made limited functional improvement during previous stays. Examples included:

- Medical Record #501259 -7/1/19 –Dr. Rosemore approved the PAS to admit patient with COPD exacerbation. Patient was assigned to Relator. Patient was independent in all ADL and required no physical therapy. Screener's PAS documentation falsely documented that the patient needed minimum to moderate assist on transfers, was dependent on ambulation, and needed moderate assistance with toileting.  Dr. Meythaler, the OT and the PT all recommended immediate discharge.  Case Management delayed discharge until 7/5/19. Occupational Therapist Hood remarked at team conference, "keeping patients like this happens all the time and we just deal with it."

- Medical record #0277120 – 4/9/19 - On admission the family informed that the patient would go to a SNF or hospice upon discharge.  Encompass-Shelby kept the patient for 3-days because it could get reimbursed up to 3 days as "reasonable and necessary."

- Medical record #501123 – 5/15/19 – A 100-year old patient was admitted and kept for 18 days even though she could not tolerate therapy and planned to enter a SNF. After 18 days, she had to be transferred to an acute care hospital. Then, on 6/17/19, Dr. Rosemore again approved her readmission in spite of her continued inability to perform therapy and her planned discharge to a SNF.

- Medical record #501132 – 5/16/19 - Dr. Rosemore approved a PAS to admit patient for early stage renal disease, congestive heart failure, and stage IV metastatic cancer. Patient was assigned to Relator who documented patient was inappropriate for admission and recommended transfer to a SNF. The patient did not agree to do therapy. Encompass-Shelby's Director of Case Management Sumer Chambless-Heralds held the patient for 19 days until Dr. Meythaler ordered immediate transfer to acute-care hospital after his order for an abdominal ultrasound that was not executed. The patient died 6 hours later.

- Medical Record #500264 – 4/24/19 –Dr. Rosemore approved a PAS to admit patient with diagnosis of end stage cardiomyopathy. Relator was assigned the patient's care. Patient told Relator he could not tolerate therapies and wanted to go on hospice. Against Relator's instructions the patient was held for 3 days, before he had to return to an acute-care hospital. Then, the patient was readmitted to Encompass-Shelby even though the patient refused therapies and wanted to go on hospice. Encompass-Shelby was paid for 8 days of inappropriate admission.

- Medical Record #501222 – 6/17/19 –Dr. Rosemore approved a PAS for patient with screener preliminary diagnosis brain injury, meningioma resection and documented 'minimal assistance to supervision'. Relator diagnosed debility, with developmental delay childhood (a childhood brain injury not a new condition), and that no therapy was required. Case management held the patient for 11 days.

- Medical Record #500952 – 4/18/19 –Dr. Rosemore approve a PAS for a patient for failure to thrive following severe left stroke and right hemiparesis. Relator was assigned the patient. He ordered a bowel program which was never executed by the nursing staff, so patient required transfer to an acute-care hospital for bowel blockage on 4/28/19. On 5/1/19, the end of a 3-day "leave of absence", a new PAS was completed so the patient could be readmitted. PT Marie Perry advised Dr. Meythaler that, based on her working with patient during his earlier admission at Encompass-Shelby and during his acute-care hospitalization at Baptist Shelby where she worked part-time, the patient had no potential for rehabilitation and was a better candidate for a SNF. Dr. Meythaler agreed and did not approve readmission. In front of Dr. Meythaler, Defendant CEO Russell ordered Dr. Rosemore to approve the PAS for re-admission.

105.   Since February of 2019, Encompass-Shelby has operated without a qualified rehabilitation physician as Medical Director. Dr. James Taylor, the Medical Director since February of 2019, is a cardiologist and has refused to approve PASs to avoid false claims exposure and practicing outside his area of medicine credentialing. Encompass-Shelby has

depended on Dr. Rosemore to approve PASs since February of 2019, even though he is not credentialed as a rehabilitation physician by Encompass-Shelby.   Every admission since February of 2019, has violated the Federal and State Payors' conditions of payment.

### G. ENCOMPASS-SHELBY FALSIFIED THERAPY DOCUMENTATION TO MEET THE "3-HOUR RULE"

106.   As a condition of payment, Medicare regulations required that each patient receive 3 hours daily therapy, 5 days a week.   42 C.F.R. § 412.29. Each patient was required to receive physical therapy 5 days a week.   At Encompass-Shelby Saturday was used as a 'make up day' for missed therapy hours and to provide therapy to new patients as required within the 36-hours of admission.

107.   Encompass-Shelby had a pattern and practice of having inadequate therapy staffing during the weekend especially on Saturday.   The understaffing lead to a lack of one-on-one therapy and the use of group therapy and therapy provided by unsupervised physical therapy and occupational therapy aides.

108.   Medicare regulations required that the preponderance of the therapy minutes be in the mode of individual therapy.   Encompass-Shelby provided a high percentage of therapy in the modes of group and concurrent therapy, and is believed to have falsely documented one-on-one therapy.

109.   Encompass-Shelby emailed the Inpatient Therapy Schedule daily to therapy department personnel.   The schedule was not available to physicians or posted in the therapy areas. It was a tightly guarded document and Relator was not provided when he served as Medical Director.   When he asked senior leadership for copies, he was denied access, which begs the question that if the Medical Director could not see the therapy schedule, which physicians

could. When copies were obtained by Relator from therapists that had concerns about understaffing, they confirmed his observations that there was insufficient staffing to provide therapy in accordance with the IPoC designed for the patients.

110.   In the evenings, patients were provided their therapy schedule for the next day. During his rounds, patients often complained to Relator that they were not getting therapy as scheduled.   Therapists also complained to Relator that they could not provide appropriate meaningful therapy with the patient overload. Relator observed that during spring and summer of 2019, therapy staff began to resign due to working conditions.  Some expressed fear of jeopardizing their licenses if they continued to work under the present conditions.

111.   Relator regularly observed inadequate therapy staffing to perform one-on-one therapy.   He observed Physical Therapy Assistants ("PTAs") and Occupational Therapy Assistants ("OTAs") providing therapy without the required supervision of a licensed PT and OT.  He observed all therapies – physical, occupational and speech - frequently occurring in groups. Some of the physical therapy hours provided by PTs at Encompass-Shelby were provided by unsupervised PTA and PT aides in a group setting. Some of the ADL training was performed by OT aides in the patients' rooms.

112.   From Encompass' opening in April 2018, until October 2019, Relator observed gym group physical therapy frequently due to severe understaffing.

113.   On a Saturday in July 2019, Relator spoke with a speech therapist who reported she was scheduled to provide speech therapy to 15 patients that day. Due to this understaffing each patient could not receive the one-hour ordered in their IPoCs.

114.    On August 17, 2019, Relator observed 4 patients in the gym in a group physical therapy session being conducted by a PTA without a licensed PT present.

115.    On August 31, 2019, Relator observed 5 patients in the gym in a group physical therapy session being conducted by one PT.  All the patients had different diagnoses and in Relator's professional judgment needed focused individualized therapy as ordered to be meaningful.

116.    Relator observed therapy aides writing progress note documentation of therapy sessions instead of the licensed therapists as required.

117.    Relator observed that the ADL activities, which are designed to be performed in a patient's room, were often conducted by an OT aide without the supervision of a licensed OT or OTA.

118.    On August 17, 2019, Relator observed two speech therapists providing reduced minute sessions to accommodate all the patients who required speech therapy.

119.    On August 26, 2019, Relator observed only 4 licensed OTs for 30 patients.  To meet the 3-hour rule some patients had their physical therapy time doubled and received 3 hours of physical therapy, and no occupational therapy as ordered in the IPoCs. As a result, Relator observed physical therapy being conducted by aides and assistants, without any licensed supervision.

120.    On September 6, 2019, Relator observed an unsupervised PTA performing arm exercises on a group of patients.  Relator was familiar with the patients and noted that the physical therapy provided was not 'focused therapy' for the patients' conditions or designed to

improve the patients' functional capacities.  Relator described the therapy as "simply meeting the time requirement of an hour, with no benefit to the patients."

121.    On September 12, 2019, Relator observed occupational therapy for a group of four patients with mixed diagnoses, i.e. stroke, hip fracture, neurological.  The therapy consisted of having the patients sitting at a table rolling a ball across the table to each other.  It was not the focused therapy ordered in the IPoC and was not designed to improve his patients' functional capacities.

### H. ENCOMPASS-SHELBY's IPOC AND TEAM MEETINGS PRESENTED FRAUDULENT DOCUMENTATION

122.    Medicare regulations required the patient's medical record for an IRF stay to contain an IPoC.  The IPoC was to be developed by the rehabilitation physician with input from the interdisciplinary team within 4 days of the patient's admission. 42 C.F.R. § 412.622(a)(4).  It was the sole responsibility of a rehabilitation physician to combine information that was required in the IPoC, including an estimated length of stay, and to document it in the patient's IRF medical record.

123.    Unlike at every other IRF where Relator had worked, he observed that Encompass-Shelby IPoCs were completed, within the proprietary electronic health record ("EHR"), by the therapists without ever receiving input from the rehabilitation physician.  At Encompass-Shelby the rehabilitation physician's role, through the ACE IT EHR, was to either 'concur' with the IPoC developed by the therapists or 'comment'.  When Relator disagreed with the therapists developed IPoC he could not delete it and create a plan, he could only provide a 'comment'.  On occasions when he made a 'comment' he experienced repeatedly that the 'comment' would be deleted by the softwarre. Relator believed the Encompass EHR was

designed to frustrate physicians to obtain a 'rubber stamp' on the IPoC with a simple click of the option "concur". For example: Patient #500896 had an IPoC developed by a therapist. Relator disagreed with the plan and selected 'other' and documented his comments.  The ACE IT system displayed a message "contact the Administrator," and would not upload his notes.  After several attempts to upload his physician notes, the computer erased his notes.  Relator persisted and after several more attempts was successful in getting his notes accepted.

124.    Relator experienced that the therapy departments were under such pressure to document 3-hours of daily therapy, that an IPoC was completed and often started before a rehabilitation physician' approved the IPoC.  Relator observed many patients receiving therapy without the appropriate protective braces for their neck and limbs, resulting in patient harm.

125.    On July 31, 2009, a patient was admitted with the screener's preliminary diagnosis of myelopathy.  Relator examined the patient and diagnosed a spinal cord injury with severe stenosis, and Brown-Sequard, a rare neurological condition characterized by a lesion in the spinal cord which results in weakness or paralysis.  Without any orders for therapy, and while Relator was consulting with an acute care hospital, the patient was taken to therapy without a cervical collar.  Relator stopped the therapy and immediately sent the patient for emergency surgery. The neurosurgeon at the University of Alabama at Birmingham Hospital informed Relator that had therapy not been stopped, the patient may have been paralyzed.

126.    Medicare regulations required a rehabilitation physician to lead a weekly coordinated interdisciplinary therapists' "team meeting" which reviewed progress with the nurses, case manager and various therapists involved in the patient's treatment.  The patient's chart was required to document the results, findings and decisions made at the meeting, the names and professional designations of the participants, and the concurrence of the rehabilitation

physician with the results, findings, and decisions.  Again, the Encompass-Shelby EHR design only allowed the rehabilitation physician/Relator to "concur" or "comment" at the weekly team meeting. 83 Fed. Reg. 38514, 3855, 42 C.F.R. § 412.622.

127.    Relator led the weekly team meeting on his patients, and most frequently found that the therapists familiar with his patients did not attend due to staffing shortages.  Each disciple – physical, occupation and speech therapy – simply sent a representative to cover all patients, not therapist who had actually rendered care.  Relator would ask questions about his patient's progress, and the common therapists' response was for Relator to review the chart because they had no personal knowledge of the patient.  When charting was poor, or non-existent, Relator had little to no progress information and the weekly team meetings lacked value. For example, on August 29, 2019, licensed OT Peeples remarked she had only seen a patient once, that she couldn't remember him, and Relator should just "refer to whatever is in the chart". That type of exchange was common.

128.    In addition to the non-attendance of therapists directly familiar with the patients, Relator found the weekly team meetings rushed. When Relator served as medical director, he was reminded frequently by Encompass-Shelby's Director of Therapy Shannon Wiggins and Sumer Chambless, Director of Case Management, that team meetings were limited to 5 minutes per patient to avoid cutting into therapy time.

129.    Lack of knowledgeable therapists' participation, poor repetitive charting, rushed team meetings designed for profit and to fulfill Medicare regulations not to render quality of care, resulted in false documentation to Government Payors, and therapy services that were often so substandard as to be worthless in value to the patients' functional status improvement goals.

I.   ENCOMPASS-SHELBY DELAYED PHYSICIAN ORDERS FOR PROSTHETIC/ORTHOTIC/THERAPEUTIC DEVICES TO SHIFT DEVICE COSTS TO PATIENTS

130.   Encompass-Shelby admitted patients in need of physical therapy that required use of a prosthetic/orthotic/therapeutic device ("devices") such as a brace (neck, leg, back,) a cervical collar, a helmet, or amputation stump protectors or coverings.

131.   Relator would order devices upon admission after completing his admission physical examination was developed.   The availability of the devices was essential for the effectiveness of the physical therapy and for patient safety.   Orders were often delayed and/or ignored. For example, Patient #501436 was admitted on August 16, 2019 following a very large craniotomy for a brain tumor.   Relator ordered a helmet to be worn for protection during therapies.   Even though Encompass-Shelby stocked the helmet, Patient #501436 was taken to therapy for 3 days without a helmet and subjected to the risk of falling.   The physical therapist remarked to Relator "I don't know why, they have them (helmet) in stock". The helmet was not delivered to the patient until August 20, 2019 after Relator filed Incident Report RL6-316833. Another example, Patient #501420, an amputee was ordered to have a prosthetic stump shrinker, a compression garment.   After 3 days the hospital still had not delivered to the patient and only provided after Relator complained and filed Incident Report RL6-316914.

132.   Device costs are included in the per diem fee earned by the IRF unless the device is ordered within 24-hours of discharge.

133.   Encompass-Shelby had a pattern and practice of unjustifiable delay in processing orders for until the patient was within 24-hours of discharge.   This prevented a patient's full participation in therapy, caused pain for the patient, resulted in patients who refused or quit therapy, and caused a loss of effective return to function, the purpose of the therapy ordered.

46

Encompass delayed the delivery of the device as a cost-savings practice and this made the care sub-standard and worthless for purposes of reimbursement.

### J. ENCOMPASS SCREENERS WERE UNQUALIFIED

134.    CMS regulation required the preadmission evaluation to be conducted by licensed or certified clinicians who were appropriately trained to assess the patient medically and functionally, and designated by a rehabilitation physician.  42 C.F.R. § 412.622(4)(i)(A).  These clinicians were called "designated clinical screeners" ("DCS") or screeners.

135.    The Encompass Medical Director's Handbook provided that Relator, as the Medical Director, would provide oversight and education to the screeners.  During orientation Relator was told the screeners were "nurses." Encompass Corporate Policy ID OPS-100 Admission Approval stated that the Medical Director would review documentation of a "pre-admission assessment *from the nurse liaison*."  An Encompass corporate admission process training PowerPoint identified the screeners as a "nurse liaison".

136.    After reviewing numerous PAS forms, Relator raised concerns about the screeners' lack of qualifications with Encompass-Shelby's Rehabilitation and Admission Liaison leadership and Defendant CEO Russell.  His concerns were ignored and dismissed.

137.    On September 28, 2018, after 5 months at Encompass-Shelby, Relator grew so concerned about the poor quality of documentation provided by screeners in the PASs he called Dr. Alex DeJesus.  Dr. DeJesus was a 20+ year medical director at Encompass Sarasota assigned to serve as Relator's medical director "mentor." Dr. DeJesus told Relator "pick your battles" and "just focus on just keeping the patients safe."

138.     Relator learned that Medicare regulations required screeners to be designated by a rehabilitation physician.  As the only rehabilitation physician on staff at Encompass-Shelby he asked Rebecca Clark, Liaison Coordinator, who had designated the screeners. Clark informed him that Encompass corporate designated screeners following an internal 3-4-day "certification training."  Relator requested the training materials but his request was denied. Relator questioned Defendant CEO Russell and other Encompass senior leadership about the screeners' qualifications/training and was told "it's not your concern, they don't report to you".  This was directly contrary to the 'duties and responsibilities' outlined in the corporate Encompass Medical Director Handbook he was provided as part of his contract with Encompass.

139.     After Relator's continued inquires Courtney Key, the Business Development Director, ordered Relator not to even speak to a screener.  Key directed that any question he had must go through her or another Admission Liaison.  Key stated the screeners were direct reports to her and Defendant CEO Russell.

140.     Encompass employed unqualified non-clinician screeners as "Rehabilitation Liaisons" to complete PAS documentation then falsely concealed that fact from Relator and Government Payors by having an Admission Liaison R.N. sign the PAS. The R.N. would sign the PAS which was completed by the unqualified non-clinician. At Encompass-Shelby and Encompass-Lakeshore these unqualified screeners included, among other persons, individuals with the last names of Boyd, Harrison, Pontarelli, Prazek and Shoemaker.

141.     Based on information and belief, and from a review of public LinkedIn accounts, these screeners had no licensed or certified clinical qualifications as required by statute. For example, Screener Brad Boyd began work at Encompass in 2019, with a B.S. in Business Administration and Management.  He had no clinical education/training and had past work

48

experience in pool and spa sales. His LinkedIn account described him as "skilled in healthcare marketing, customer service, strategic planning and hospital relationships".  Screener Pontarelli began work at Encompass in 2017, with a B.S. in Sport Management. He had no clinical education/training and had past work experience in medical sales. His LinkedIn account described him as a "high-energy sales professional with experience developing product awareness through consultative sales".  Screener Terri Shoemaker began work at Encompass in 2019, with a B.S. degree.  She had no clinical education/training, and had past experience marketing for medical weight loss and home health.

142.    Based on information and belief, some of the unqualified, non-clinician screeners from Encompass-Shelby performed the same screener services for Encompass-Lakeshore. Based on Encompass' national job postings, this same lack of clinically qualified screeners and false signatures by RNs has occurred throughout the United States since 2014. This deceptive business practice has resulted in tens of thousands of false certifications.

## K.  ENCOMPASS IMPROPERLY STEERED PATIENTS AND PROVIDED KICKBACKS TO ENCOMPASS HOME HEALTH AGENCY

143.    The Balanced Budget Act of 1997 required, as a condition of participation, that any patient discharged to use post-hospital care of a home health agency or hospice be provided a list of such agencies from which to choose. The IRF staff was to disclose any financial interest the hospital had in a home health agency, to not improperly influence a patient to select the hospital's affiliated home health agency, and to respect the patient's choice,

144.    EHHH 'overlaps' in 89 of Encompass' IRF geographic areas of operation. In the service area of Encompass-Shelby and Encompass-Lakeshore, Encompass overlapped with 2 EHHH locations.

145.     In 2018, Encompass IRFs discharged 59% of patients, or approximately 107,000 discharges, to receive home health services. Internally, the discharges were discussed as a revenue pipeline for the parent Encompass' EHHH agencies, which received only 21% of those discharges. In 2018, Encompass prioritized acquisition of home health agencies that overlapped with its IRFs.  Encompass advised investors that its "key operational initiative" was "clinical collaboration focus on the Medicare beneficiary population" between the Encompass IRFs and EHHH locations, with a projected 10% annual admission growth in 2019.

146.     At Encompass IRFs the Department of Case Management was responsible for patient discharge planning. It was the pattern and practice at Encompass-Shelby for the case manager to unilaterally order home health care in over 66% of all patients, and then obtain a physician's signature. Relator, based on his experiences and discussions, believed this to be a nationwide practice and pattern for Encompass and excessive referrals.

147.     In mid-2018, Encompass promoted a 'playbook' to improve post-acute care transitions from its IRFs to its home health locations in a project called "TeamWorks" in Home Health Care News in a June 13, 2008, interview with the Encompass CEO.  TeamWorks was described as a clinical collaboration initiative where Encompass had an IRF and EHHH site.  It described a 'care transition coordinator or CTC who would transition the patient from an Encompass IRF to its EHH location by getting involved in the patient's progress 'early on'.

148.     Encompass, focused on building market density in home health, acquired Birmingham based AlaCare Home Health Agency ("AlaCare") for $217.5M in 2019, to expand its home health presence in the Jefferson/Shelby county areas of Alabama.  After the AlaCare acquisition, EHHH placed Nurse Coordinator Paige Landry on-site at Encompass-Shelby.

Landry's role was to provide the IRF assistance in discharge planning, home care coordination and to serve as a liaison to induce referrals from Encompass-Shelby.

149.    Relator observed that patients were provided a 'digitalized list' on a computer screen of home health agencies from which to choose, not a piece of paper they would review, study and discuss with their family.  Case Management advised Relator that if a patient or family did not have a prior home health relationship, Encompass employees were instructed to show the computer screen and then say "would you like Encompass Home Health?"; thereby suggesting an answer and 'steering' the patient to Encompass.

150.    Relator asked to see the computerized list and his request was denied.  Relator asked to receive a printout of the computerized list shown patients and his request was denied.

151.    Relator observed patient signed 'choice' documents selecting EHHH when the patients were known to be incompetent.

152.    At Encompass-Shelby over two-thirds of all patient discharges were ordered to home health and received continuing care from EHHH.

153.    Beginning in August of 2019, EHHH began providing a Nurse Coordinator/CTC Paige Landry to Encompass-Shelby to assist with discharge planning in violation of the anti-kickback provisions.  This coordinator was permitted (1) to review medical records to identify potential patients for home health referral and (2) to round on patients and attend weekly team meetings and speak about discharge planning, before the patient has even been referred to home health.  Competitor home health agencies were not given such access to potential patients' records or present in the hospital.

154.    Encompass was using the TeamWorks program to embed the EHHH liaisons into Encompass IRF locations to steer patients and provide free discharge planning to the IRF. As a condition of participation, Medicare and Medicaid required an IRF to provide discharge planning for patients.  Encompass was reimbursed for these services as part of the IRF-PPS payment. The collusion of Encompass IRF and EHHH was in violation of The Anti-Kickback Act, 42 U.S.C. § 1320a – 7b(b)(2).

155.    Where Encompass has an IRF and home health services it tracks a "collaboration rate" to show what percentage of IRF discharges to home health come to use EHHH.  In 2015 the rate was 18.5%, but under the new TeamWorks program, the 2019 collaboration rate rose to 35.6%.

### COUNT I
### FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS
### 31 U.S.C. § 3729 (a)(1)(A)

156.    Relator repeats and realleges the preceding paragraphs contained in this Complaint as fully set forth herein.

157.    By means of the acts described above and from at least September of 2014 through the present, Defendants knowingly presented or caused to be presented false and fraudulent claims in violation of Federal and/or State laws to the agencies of the United States identified above in violation of 31 U.S.C. § 3729 and other applicable law.

158.    Defendants' conduct was the proximate and actual cause of hundreds of millions of dollars in unearned Government Payors' payments made to Encompass.

159.    As a result of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States

is entitled to penalties of at least $11,665.00 and up to $23,331 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT II
## FALSE CLAIMS ACT: MAKING OR USING A FALSE RECORD OF STATEMENT TO CAUSE A CLAIM TO BE PAID IN VIOLATION OF 31 U.S.C. §3729 (a)(1)(B)

160.    Relator repeats and realleges the preceding paragraphs contained in this Complaint as fully set forth herein.

161.    As more particularly set forth in the foregoing paragraphs, by means of the acts described above. Defendants has knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Federal and/or State Governments.

162.    The United States and State Governments, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations, approved, paid, and participated in payments for claims that would otherwise not have been allowed.

163.    As a result of the Defendants' acts, the Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the Government is entitled to penalties of at least $11,665.00 and up to $23,331 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein..

## COUNT III
## FALSE CLAIMS ACT: MAKING OR USING A FALSE RECORD OF STATEMENT TO AVOID AN OBLIGATION TO REFUND IN VIOLATION OF 31 U.S.C. §3729 (a)(1)(G)

164.    Relator repeats and realleges the preceding paragraphs contained in this Complaint as fully set forth herein.

165.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Encompass has knowingly made, used, or caused to be made or used, false records or false statements – i.e. the false certification made or caused to be made by Encompass- material to an obligation to pay or transmit money to the Federal and/or State Governments or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Federal and/or State Governments.

166.    As a result of the Defendants' acts, the Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the Government is entitled to penalties of at least $11,665.00 and up to $23,331 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT IV
## FALSE CLAIMS ACT: CONSPIRACY TO DEFRAUD IN VIOLATION OF
## 31 U.S.C. §3729 (a)

167.    Relator repeats and realleges the preceding paragraphs contained in this complaint as fully set forth herein.

168.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Encompass has conspired to make or present false or fraudulent claims and performed one or more acts to effect payment of false and fraudulent claims.

169.    As a result, the Federal and/or State Governments have suffered damages in the form of hundreds of millions of dollars in unearned Government Payors program payments made to Encompass.

## COUNT V
## FALSE CLAIMS ACT: RETALIATION IN VIOLATION
## OF 31 U.S.C. § 3730(h)

170.    By virtue of the activities described above, Relator has engaged in conduct protected under the False Claims Act.

171.    Defendants Encompass, Russell and Bartell were aware of Relator's actions.

172.    Defendants Encompass, Russell and Bartell discriminated against Relator, from at least February 2019 through the present, in retaliation for his aforesaid conduct protected under the False Claims Act, as follows:

(a)    In the Fall and Winter of 2018, Defendant CEO Russell and other senior leaders at Encompass-Shelby complained that Relator was taking too long to approve PASs and was causing extra work on the Rehabilitation and Admission Liaisons by requesting additional information about potential patient's medical history and functionality. At times he was told by the Admission Liaison Department that the additional information he requested was not necessary, that they would not get it for him and he should just be a 'team player' and admit the patient.

(b) He was told by Defendant CEO Russell to approve PASs within 20 minutes of receipt.  Through the ACE IT system's EHR, when Relator did not 'concur' to admit a patient, an electronic notification was sent to senior admission leadership and Defendant CEO Russell. This triggered pressure for Relator to admit or 'doctor shopping' the PAS to Dr. Rosemore to admit the patient. 'Won' was the term used in internal training to describe an 'admission.'

(c)      Relator reported concerns up the chain of command internally and spoke with his Encompass assigned medical director mentor Dr. Alex DeJesus, a 20+ year medical director at Encompass Sarasota, Florida, and raised concerns about the inappropriate admissions and the screening process.  Dr. DeJesus said to Relator "pick your battles" and "just keep the patients safe."  Relator, upon information and belief, now believes Dr. DeJesus informed Encompass of Relator's complaints to him.

(d)      On more than one occasion when Relator refused to admit a patient Defendant CEO Russell obtained a "second opinion" from Dr. Rosemore.  Dr. Rosemore approved every patient Relator had refused to admit for lack of medical necessity with only one exception when Dr. Rosemore called and spoke with Relator.  On all other occasions Dr. Rosemore did not speak with Relator about the "second opinion" request.

(e)      On one occasion Relator declined to admit a patient and Defendant CEO Russell - in front of Relator- directed staff to admit the patient immediately without a rehabilitation physician approved PAS. He feared the delay would cause the patient to go elsewhere.  After the patient was brought to Encompass for admission, Russell obtained approval of the PAS by Dr. Rosemore to "paper" Russell's admission order. Russell felt great pressure to meet the census numbers set by Encompass, and eventually, in July of 2019, was terminated because he did not meet its arbitrary census projections. Based on information and belief, Russell is now working as a respiratory therapist.

(f)      Finally, after several months of asking questions about documentation and questionable admissions, Relator began to file written formal complaints hoping it would get the attention of senior leaders outside of Encompass-

56

Shelby and trigger improvements. Instead, Relator was retaliated against for not being a team player and his contract as Medical Director was terminated early by Defendant CEO Russell on February 10, 2019.  While informing Relator of this termination, Defendant CEO Russell said "you are too difficult to work with."

(g)     After Defendant CEO Russell terminated Relator, Defendants Encompass and Russell hired Dr. James Taylor as Medical Director. Dr. Taylor was a cardiologist with little experience in rehabilitative medicine.  As a condition of payment and participation, Encompass-Shelby was required to have a Medical Director who was a *rehabilitation physician* by training or two years of experience. Dr. Taylor knew he lacked the qualifications and refused to approve PASs.  Dr. Taylor also provided no supervision of the admission liaisons, rehabilitation liaisons, or medical staff, and was rarely present at Encompass-Shelby yet drew compensation to serve as Medical Director since CMS mandates that position.  In September 2019, when CEO Defendant Bartell discharged one of Relator's patients without an order, Relator filed a written complaint about Bartell 'practicing medicine without a license.' Dr. Taylor was copied on the complaint as medical director. Dr. Taylor responded to Relator that he would consider the complaint as 'informational only.'

(h) Defendant CEO Russell, in spite of terminating Relator's contract, continued to ask Relator to approve PASs since Dr. Taylor was not qualified under the Medicare conditions of payment to approve PASs.  Relator refused. Then Defendants Encompass and Russell obtained the cooperation of Dr. Rosemore to approve PASs from February 10, 2019 to the present. In exchange for performing this non-compensated

Medical Director's service, Dr. Rosemore was assigned more patients resulting in an increased in his practice revenues and a decrease in Relator's.

(i), Defendant CEO Bartell was hired to serve as Interim Chief Executive Officer at Encompass-Shelby from August 29, 2019 to September 30, 2019, in addition to his services as CEO at Encompass-Lakeshore.  He continued to create a dangerous working environment by taking direct actions impacting Relator's patients, i.e. practicing medicine without a license, and creating a hostile work environment to retaliate against Relator to constructively discharge and push him out of Encompass-Shelby. Specifically:

(j) On September 6, 2019, Defendant CEO Bartell was advised that it was Relator's clinical judgement that readmission of Patient #501451 "T.S." was inappropriate because T.S. had been unable to perform therapy during his prior admission. Relator opined that T.S. was appropriate for SNF placement not IRF hospitalization. Defendant CEO Bartell ignored the Relator's professional judgement and ordered T.S. readmitted.  Since T.S. was within the 3-day window of an IRF 'leave of absence' his readmission did not require a new PAS to be approved by a physician. Defendant CEO Bartell then removed Relator as the physician and reassigned T.S.'s care to Dr. Rosemore.  Dr. Rosemore texted Relator on September 6, 2019, that Defendant CEO Bartell was upset and warned Relator "he (Bartell) will shut down ur admissions and replace u".

(k) Patient #501452 "C.R." was scheduled by case management to be discharged to "home" on September 10, 2019. Relator had recommended C.R. go to a SNF due to his physical condition and his wife's inability to assist her 83-year old

husband.  Encompass-Shelby had been informed early on of the family's request that C.R. go to a SNF. C.R.'s step-son, a physician, even complained that Encompass-Shelby overstated C.R.'s clinical capabilities to justify a home discharge.  While the family was working with C.R.'s Medicare Advantage plan for SNF placement, C.R.'s RAND expired so Encompass-Shelby would not be paid any additional monies if C.R. occupied a bed. On September 10, 2019, Defendant CEO Bartell directed Case Management discharge C.R.  to home or get C.R.  to pay $1,500/day, for 5 days in advance.  On September 11, 2019, when he saw C.R. had not been discharged the day before, Defendant CEO Bartell held his daily leadership 'huddle' and told Case Manager Beth Eades "I don't care where he goes as long as he's out of here" today. That day, against his family's wishes, C.R. was sent home via Carevan (transportation service) when the family did not pick him up. Encompass-Shelby assigned EHHH to "follow up", without giving C.R. a choice of home health provider. Defendant CEO Bartell discharged C.R. without informing Relator, his physician, and without consultation with the Internal Medicine Consulting team or any physician order. Upon arriving at home, C.R. was in such poor medical condition that his oncologist admitted him to UAB-West acute care hospital. This unethical behavior of Encompass-Shelby, and its false documentation of C.R.'s functional capabilities, was observed by Relator and C.R.'s step-son, an orthopedic physician.

(l)     The treatment of C.R. was a 'final straw' for Relator since Encompass' retaliation had moved to the point of endangering his livelihood, and Relator had no choice but to resign.  Dr. Rosemore called Relator and said "Jay, you're smart and nice and I like you, but I'm glad you're leaving. You are not cut out for corporate medicine. There's a balancing act and you don't want to be tipped over."

(m)     Relator provided excellent services to Encompass throughout the tenure of his contract and even after the contract was retaliatorily terminated. He was faced to either continue working in an environment, in which the law was being violated on a daily basis, or, after being stripped of his responsibilities and patients, to resign his staff privileges.  After Relator saw that Defendant CEO Bartell would continue the illegal practice of improper admissions, and illegally practiced medicine by directing the discharge of Relator's patients without his knowledge and order, Relator had no choice but to resign.

173.    As a consequence of retaliation, Relator was removed as Medical Director and as Chief of the Medical Staff with harm to his reputation. By virtue of this discrimination, Relator suffered significant pecuniary and non-pecuniary harm damages in violation of 31 U.S.C. § 3730(h).     Further, the fear of professional reputational harm forced Relator to protect livelihood and make the painful decision to accept no new patients after September 9, 2019.

**COUNT VI**
**OPERATING WITHOUT A QUALIFIED *DIRECTOR***
***OF REHABILITATION*, IN VIOLATION OF A MEDICARE**
**CONDITION OF PAYMENT UNDER 42 C.F.R. § 412.29(G)**
**AND THE STARK ACT.**

174.    Relator repeats and realleges the preceding paragraphs contained in this complaint as fully set forth herein.

175.    As a condition of payment, Encompass was required to have a *director of rehabilitation* or Medical Director who was a *rehabilitation physician,* defined by having an Alabama medical license and either 2 years of training or experience in the medical-management of inpatients requiring rehabilitation services. *See*, 42 C.F.R. § 412.29(g).

176.   From February 11, 2019 to the present, Encompass operated Encompass-Shelby IRF under the medical directorship of Dr. James Taylor, a cardiologist.  Dr. Taylor was credentialed by Encompass-Shelby to practice medicine within the limited scope of cardiology.

177.   By means of the acts described above and from February 11, 2019 through the present, Defendant Encompass knowingly presented or caused to be presented Medicare and Medicaid claims for payment or approval in violation of a condition of payment, in violation of 42 C.F.R. § 412.29 (g).

178.   Encompass also violated the Stark Act by entering into a bogus Medical Director Contract with Dr. Taylor. Specifically, Encompass paid the fair market value for a qualified Medical Director rehabilitation physician, when Dr. Taylor failed to meet the requirements and has not render the services required by Encompass' Medical Director Contract.  Encompass paid Dr. Taylor, but used Dr. Rosemore to conduct PAS approvals. As a kickback, Encompass assigned more patients to Dr. Rosemore.  Encompass-Shelby operated without proper oversight as required by Medicare and every claim it submitted was false for the lack of this condition of payment from February 10, 2019 to the present, in violation of 42 U.S.C. § 1395 nn (3)(A)(v).

179.   The Federal and/or State Governments, unaware of the falsity of the claims made by the defendants, and in reliance on the material fraudulent or false representations within the claims, approved, paid and participated in payments for claims that would otherwise not have been allowed or paid. The United States has damaged, and continues to be damaged in the form of an unspecified amount of losses and damages to the Federal and/or State Payor Programs identified herein.

**COUNT VII**
**PRESENTING FRAUDULENT CLAIMS TO STATE PAYORS**
**(CALIFORNIA FALSE CLAIMS ACT)**
**(Cal Gov't Code §§ 11651 - 12656 (2010))**

180.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

181.    This is a claim for treble damages and civil penalties under the California False Claims Act. Cal. Gov't Code §§ 12651 - 12656(2010).

182.    By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the California State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

183.    By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve or pay such false and fraudulent claims.

184.    By virtue of the acts described above, the Defendants conspired to violate the California False Claims Act.

185.    The California Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the by the Defendants, paid and continues to pay the claims that otherwise would not have been allowed.

186.    By reason of these payments, the California Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

62

187.     The State of California is entitled to the maximum penalty of $11,000.00 and up to three times the amount of damages sustained by the State for each and every false or fraudulent claim, record or statement made, used presented or caused to be made, used or presented by the Defendants.

188.     The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the California Payor Programs identified herein.

**COUNT VIII**
**PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR**
**(COLORADO MEDICAID FALSE CLAIMS ACT)**
**(Colo. Rev. Stat. §§ 25.5-4-303.5 – 25.5-4-310 (2011))**

189.     All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

190.     This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5 – 25.5-4-310 (2011).

191.     By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Colorado State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

192.     By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

193.     By virtue of the acts described above, the Defendants conspired to

194.     The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continue to pay for claims that otherwise would not have been allowed.

195.     By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

196.     Pursuant to Colo. Stat. Ann. § 25.5-4-305, Colorado is entitled to three times the amount of actual damages plus the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendants, except that this upper limit on liability is subject to an automatic increase to equal the civil penalty allowed under the federal False Claims Act, 31 U.S.C. § 3729, *et seq*., if an as the penalties in such federal act may be adjusted in accordance with the federal Civil Penalties Inflation Adjustment Act of 1990.

197.     The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the Colorado Payor Programs identified herein.

**COUNT IX**
**PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR**
**(DELAWARE FALSE CLAIMS AND REPORTING ACT)**
**(Del. Code Ann. tit. 6, §§ 1201 - 1211)**

198.     All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

199.     This is a claim for treble damages and civil penalties under the Delaware False Claims and Reporting Act., Del. Code Ann. tit. 6, §§ 1201-1211.

200.    By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Delaware State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

201.    By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

202.    By virtue of the acts described above, the Defendants conspired to violate the Delaware False Claims and Reporting Act.

203.    The Delaware Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid for claims that otherwise would not have been allowed.

204.    By reason of these payments, the Delaware Program has been damaged, and continues to be damaged in a substantial amount.

205.    Pursuant to Del Code Ann. Titl. 6, § 1201(a), the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used or presented or caused to be made used or presented by the Defendants.

206.    The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the Delaware Payor Programs identified herein.

## COUNT X
## PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR
## (FLORIDA FALSE CLAIMS ACT)
### (Fla. Stat. Ann. §§ *68.081-68.09 (2012)*)

207.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

208.    This is a claim for treble damages and civil penalties under the Florida False Claims Act., Ga. Code Ann. §§ *68.081-68.09 (2012)*.

209.    By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Florida State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

210.    By virtue of the acts described above, the Defendants knowingly made, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

211.    By virtue of the acts describe herein, the Defendants conspired to violate the Florida False Claims Act.

212.    The Florida Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid for claims that otherwise would not have been allowed.

213.    By reason of these payments, the Florida Program has been damaged, and continues to be damaged in a substantial amount.

214.     Pursuant to Fla. Stat. An.. § 68.082(2), the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendants.

215.     The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the Florida Payor Programs identified herein.

**COUNT XI**
**PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR**
**(GEORGIA FALSE MEDICAID CLAIMS ACT)**
**(Ga. Code Ann. §§ 49-4-168 – 49-4-168.6)**

216.     All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

217.     This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act., Ga. Code Ann. §§ 49-4-168 – 49-4-168.6.

218.     By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Georgia State Government programs false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

219.     By virtue of the acts described above, the Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

220.     By virtue of the acts described herein, the Defendants conspired to violate the Georgia False Medicaid Claims Act.

221.     The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid for claims that otherwise would not have been allowed.

222.     By reason of these payments, the Georgia Program has been damaged, and continues to be damaged in a substantial amount.

223.     Pursuant to Ga. Code. Ann. § 49-4-168.1(a), the State of Georgia is entitled to three times the amount of actual damages plus the maximum penalty o $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendants.

224.     The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the Georgia Payor Programs identified herein.

**COUNT XII**
**PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR**
**(ILLINOIS FALSE CLAIMS ACT)**
**Ill. Compiled Stat. § 740 ILCS 175**

225.     All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

226.     This is a claim for treble damages and civil penalties under the Illinois False Claims Act., Ill. Compiled Stat. § 740 ILCS 175.

227.     By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Illinois State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

228.    By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Illinois State Government to approve or pay such false and fraudulent claims.

229.    By virtue of the acts described herein, the Defendants conspired to violate the Illinois False Claims Act.

230.    The Illinois Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented, or caused to be made, used or presented by the Defendants, paid for claims that otherwise would not have been allowed.

231.    By reason of these payments, the Illinois Program has been damaged, and continues to be damaged in a substantial amount.

232.    The State of Illinois is entitled to the maximum penalty of $11,000.00 and up to three times the amount of damages sustained by the State for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used or presented by the Defendants.

233.    The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the Illinois Payor Programs identified herein.

**COUNT XIII**
**PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR**
**(INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT)**
**Ind. Code Ann. §§ 5-11-5.5-1 - 5-11-5.5-18 (Lexi.-. Nexis 2012)**

234.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

235.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act., Ind. Code Ann. §§ 5-11-5.5-1 - 5-11-5.5-18 (Lexi.-. Nexis 2012).

236.    By virtue of the false marketing and submissions of non-reimbursable claims described above, the Defendants knowingly presented or caused to be presented to the Indiana State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

237.    By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

238.    By virtue of the acts described herein, the Defendants conspired to violate the Indiana False Claims and Whistleblower Protect Act.

239.    The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used presented or caused to be made, used or presented by the Defendant, paid for claims that otherwise would not have been allowed.

240.    By reason of these payments, the Indiana Program has been damaged, and continues to be damaged in a substantial amount.

241.    Pursuant to Ind. Code § 5-11-5.7-2, the State of Indiana is entitled to the maximum penalty of $11,000.00, as adjusted by the federal Civil Penalty Inflation Adjustment Act of 1990, and up to three times the amount of damages sustained by the State for each and every false or fraudulent claim, record or statement made, used presented or caused to be made, used or presented by the Defendants.

242.     The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the Indiana Payor Programs identified herein.

### COUNT XIV
### PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR
### (LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW)
### (La. Rev. Stat. Ann § 46.437.1 – 46.437.14 (2012)

243.     All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

244.     This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann.§ 46:437.1 - 46.437.14 (2012).

245.     By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Louisiana State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

246.     By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or caused false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

247.     By virtue of the acts described herein, the Defendants conspired to violate the Louisiana Medical Assistance Programs Integrity Law.

248.     The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements, and claims made, used presented or caused to be made, used or presented by the Defendants, paid for claims that otherwise would not have been allowed.

71

249.    By reason of these payments, the Louisiana Program has been damaged, and continues to be damaged in a substantial amount.

250.    Pursuant to La. Rev. Stat. Ann. § 46:438.6, the State of Louisiana is entitled to three times the amount of actual damages plus the maximum penalty of $11,000.00, adjusted according to the federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false of fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendants.

251.    The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the Louisiana Payor Programs identified herein.

**COUNT XV**
**PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR**
**(MARYLAND FALSE CLAIMS AGAINST STATE HEALTH PLANS**
**AND STATE HEALTH PROGRAMS)**
**(Md. Health-Gen Code Ann. §§ 2-601 – 2-611 (2012))**

252.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

253.    This is a claim for treble damages and civil penalties under the Maryland False Claims Against State Health Plans and State Health Programs, Md. Health-Gen Code Ann. §§ 2-601-2-611 (2012).

254.    By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Maryland State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

255.    By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

256.    By virtue of the acts described above, the Defendants conspired to violate the Maryland False Claims Against State Health Plans and State Health Programs law.

257.    The Maryland Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid for claims that otherwise would not have been allowed.

258.    By reason of these payments, the Maryland Program has been damaged, and continues to be damaged in a substantial amount.

259.    Pursuant to Md. Health-Gen Code Ann. § 2-602(b), the State of Maryland is entitled to three times the amount of actual damages plus the maximum penalty of $10,000.00 for each and every false of fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendants.

260.    The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the Maryland Payor Programs identified herein.

**COUNT XVI**
**PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR**
**(MASSACHUSETTS FALSE CLAIMS ACT)**
**(Mass. Ann. Laws Ch. 1, § S(A)-(O) (2012))**

261.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

262.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, § S(A)-(0) (2012).

263.    By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Massachusetts State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

264.    By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

265.    By virtue of the acts described herein, the Defendants conspired to violate the Massachusetts False Claims Act.

266.    The Massachusetts Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendant, paid for claims that otherwise would not have been allowed.

267.    By reason of these payments, the Massachusetts Program has been damaged, and continues to be damaged in a substantial amount.

268.    Pursuant to Mass. Gen. Laws ch. 12, § 5B, the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty of $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false or fraudulent claim made, used, presented or caused to be made, used or presented by the Defendants.

74

269.    The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the Massachusetts Payor Programs identified herein.

## COUNT XVII
## PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR
## (NEW HAMPSHIRE MEDICAID FRAUD AND FALSE CLAIMS)
## (NH. Rev. Stat. Ann. §§ 167:61 – 167:62 (2012))

270.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

271.    This is a claim for treble damages and civil penalties under the New Hampshire Medicaid Fraud and False Claims, NH. Rev. Stat. Ann. §§ 167:61 – 167:62 (2012).

272.    By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Hampshire State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

273.    By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

274.    By virtue of the acts described herein, the Defendants conspired to violate the New Hampshire Medicaid Fraud and False Claims law.

275.    The New Hampshire Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid for claims that otherwise would not have been allowed.

276.    By reason of these payments, the New Hampshire Program has been damaged, and continues to be damaged in a substantial amount.

277.    Pursuant to N.H. Rev. Stat. Ann § 167:61-b(I), the State of New Hampshire is entitled to three times the amount of actual damages plus the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendants.

278.    The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the New Hampshire Payor Programs identified herein.

<u>**COUNT XVIII**</u>
<u>**PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR**</u>
<u>**(NEW JERSEY FALSE CLAIMS ACT)**</u>
<u>**(N.J. Stat. Ann. §§ 2A:32C-1 – 2A:32C-18 (2012))**</u>

279.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

280.    This is a claim for treble damages and civil penalties under the New Jersey False Claims Act., N.J. Stat. Ann. §§ 2A:32C-1 – 2A:32C-18 (2012).

281.    By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Jersey State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

282.     By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

283.     By virtue of the acts described herein, the Defendants conspired to violate the New Jersey False Claims Act.

284.     The New Jersey Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid for claims that otherwise would not have been allowed.

285.     By reason of these payments, the New Jersey Program has been damaged, and continues to be damaged in a substantial amount.

286.     The State of New Jersey is entitled to a civil penalty for each false or fraudulent claim of not less than and not more than the civil penalty allowed under the federal False Claims Act, 31 U.S.C. § 3729, *et seq*., as may be adjusted in accordance with the inflation adjustment procedures prescribed in the federal Civil Penalties Inflation Adjustment Act of 1990, plus three times the amount of damages which the State sustains arising from the Defendants' unlawful conduct as described herein.

287.     The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the New Jersey Payor Programs identified herein.

## COUNT XIX
## PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR
## (NEW MEXICO MEDICAID FALSE CLAIMS ACT)
## (N.M. Stat. Ann. §§ 27-14-1 – 27-14-15 (2012))

288.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

289.    This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act., N.M. Stat. Ann. §§ 27-14-1 – 27-14-15 (2012).

290.    By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Mexico State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

291.    By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

292.    By virtue of the acts described herein, the Defendants conspired the violate the New Mexico Medicaid False Claims Act.

293.    The New Mexico Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid for claims that otherwise would not have been allowed.

294.    By reason of these payments, the New Mexico Program has been damaged, and continues to be damaged in a substantial amount.

295.    Pursuant to N.M. Stat. Ann § 27-14-4, the State of New Mexico is entitled to three times the amount of action damages plus the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendants.

296.    The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the New Mexico Payor Programs identified herein.

<strong>COUNT XX<br>PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR<br>(NORTH CAROLINA FALSE CLAIMS ACT)<br>(N.C. Gen. Stat. §§ 1-605 – 1-618)</strong>

297.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

298.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act., N.C. Gen. Stat. §§ 1-605 – 1-618.

299.    By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the North Carolina State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

300.    By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

301.    By virtue of the acts described herein, the Defendants conspired to violate the North Carolina False Claims Act.

302.    The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid for claims that otherwise would not have been allowed.

303.    By reason of these payments, the North Carolina Program has been damaged, and continues to be damaged in a substantial amount.

304.    Pursuant to N.C. Gen Stat. § 1-607, the State of North Carolina is entitled to three times the amount of actual damages and the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendants.

305.    The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the North Carolina Payor Programs identified herein.

## COUNT XXI
## PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR
## (OKLAHOMA MEDICAID FALSE CLAIMS ACT)
## (Okla. Stat. tit. 63, §§ 5053 – 5053.7)

306.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

307.    This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act., Okla. Stat. tit. 63, §§ 5053 – 5053.7.

308.    By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Oklahoma

State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

309.     By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

310.     By virtue of the acts described above, the Defendants conspired to violated the Oklahoma Medicaid False Claims Act.

311.     The Oklahoma Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid for claims that otherwise would not have been allowed.

312.     By reason of these payments, the Oklahoma Program has been damaged, and continues to be damaged in a substantial amount.

313.     Pursuant to 63 Okl. St. Ann. § 5053.1(B), the State of Oklahoma is entitled to three times the amount of actual damages plus the maximum penalty of $10,000, unless a penalty is imposed for the act of that person in violation of the federal False Claims Act for the same or a prior action, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendants.

314.     The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the Oklahoma Payor Programs identified herein.

## COUNT XXII
## PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR
## (TENNESSEE MEDICAID FALSE CLAIMS ACT)
## (Tenn. Code Ann. §§ 71-5-181, *et* seq.)

315.     All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

316.     This is a claim for treble damages and civil penalties under the Tennessee False Claims Act., Tenn. Code Ann. §§ 71-5-181, *et* seq.

317.     By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Tennessee State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

318.     By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

319.     By virtue of the acts described above, the Defendants conspired to violate the Tennessee Medicaid False Claims Act.

320.     The Tennessee Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid for claims that otherwise would not have been allowed.

321.     By reason of these payments, the Tennessee Program has been damaged, and continues to be damaged in a substantial amount.

322.    Pursuant to Tenn. Code § 71-5-182(a)(1), the State of Tennessee is entitled to three times the amount of actual damages plus the maximum penalty of $25,000.00, adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false or fraudulent claim, record or statement made, used presented or caused to be made, used or presented by the Defendants.

323.    The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the Tennessee Payor Programs identified herein.

## COUNT XXIII
## PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR
## (TEXAS MEDICAID FRAUD PREVENTION ACT)
## (Tex. Hum. Res. Code Ann. §§ 36.001 – 36.132 (2012))

324.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

325.    Under the Texas Medicaid Fraud Prevention Act ("TMFPA"), an unlawful act subjects a defendant to liability for the value of payment related to the unlawful act.

326.    There are thirteen unlawful acts specified in the TMFPA:

1.      Knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

2.      Knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

3.      Knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than or the benefit of the person on whose benefit it was received;

4.      Knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning: (A) the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, including certification or recertification as: (i) a hospital; (ii) a nursing facility; (iii) a hospice; (iv) an ICF-IID; (v) an assisted living facility; or (vi) a home health agency; or (B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

5.      Except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

6.      Knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who: (A) is not licensed to provide the product or render the service, if a license is required; or (B) is not licensed in the manner claimed;

7.      Knowingly makes or causes to be made a claim under the Medicaid program for: (A) a service or product that has not been approved or acquiesced in by a

treating physician or health practitioner; (B) a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or (C) a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate;

8.      Makes a claim under the Medicaid program and knowingly fails to indicate the type of license and identification number of the licensed health care provider who actually provided the service;

9.      Conspired to commit a violation of these enumerated acts;

10.      Is a managed care organization that contracts with the commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly: (A) fails to provide to an individual a health care benefit or service that the organization is required to provide under the contract; (B) fails to provide to the commission or appropriate state agency information required to be provided by law, commission or agency rule, or contractual provision; or (C) engages in a fraudulent activity in connection with the enrollment of an individual under the Medicaid program in the organization's managed care plan or in connection with marketing the organization's services to an individual eligible under the Medicaid program;

11.      Knowingly obstructs an investigation by the attorney general of an alleged unlawful act under this section;

12.      Knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state

under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decrease an obligation to pay or transmit money or property to this state under the Medicaid program; or

13.   Knowingly engages in conduct that constitutes a violation under Section 32.039(b).

327.   By virtue of the facts set forth above, the Defendants committed unlawful acts as defined by the TMFPA.

328.   Pursuant to the Tex. Hum. Res. Code Ann. § 36.052, a person who commits an unlawful act is liable to the State of Texas for: (1) the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party; (2) interest on the amount of the payment or the value of the benefit described by Subdivision (1); (3) a civil penalty; and (4) two times the amount of the payment or the value of the benefit described by Subdivision (1).

329.   Accordingly, the State of Texas is entitled to two times the amount of any payments obtained by the Defendants from the Texas Medicaid program as a result of the Defendants' unlawful acts, along with appropriate interest and civil penalties.

### COUNT XXIV
### PRESENTING FRAUDULENT CLAIMS TO STATE PAYOR
### (VIRGINIA FRAUD AGAINST TAXPAYERS ACT)
### (Va. Code Ann. §§ 8.01-216.1 – 8.01-216.19)

330.   All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

331.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann §§ 8.01-216.1 – 8.01-216.19.

332.    By virtue of the false marketing and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Virginia State Government false or fraudulent claims for the improper payment for false claims for treatment and used false or fraudulent records to accomplish this purpose.

333.    By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or use false records and statements, and omitted material facts, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

334.    By virtue of the acts described above, the Defendants conspired to violate the Virginia Fraud Against Taxpayers Act.

335.    The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid for claims that otherwise would not have been allowed.

336.    By reason of these payments, the Virginia Program has been damaged, and continues to be damaged in a substantial amount.

337.    Pursuant to Va. Code § 8.01-216.3(A), the Commonwealth of Virginia is entitled to three times the amount of actual damages plus the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendants.

338.     The Defendant's conduct was the proximate natural cause of more than One Million Dollars ($1,000,000.00) in loss and damages to the Virginia Payor Programs identified herein.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator-Plaintiff respectfully requests this Court enter judgment against the Defendants as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false and fraudulent claims alleged within this Complaints, as the Civil False Claims Act, 31 U.S.C. §3729 *et seq.* provides, and the analogous damages and penalties under the individual State statutes;

(b)     That Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law and analogous provisions of the state false claims acts;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pursing this action;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

(e)     That Relator be awarded compensation for the retaliatory discrimination in violation of § 3730(h);

(f)     That this Court award such other and further relief as it deems proper.

## **JURY DEMAND**

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Date: February 21, 2020

Respectfully submitted,

*s/E. Alice H. Martin*
ALICE H. MARTIN, Esq.
ASB 9185-N72A
*Attorney for Plaintiff/Relator*
*Jay Meythaler, M.D.*
MARTIN LEGAL & COMPLIANCE SERVICES, LLC
Post Office Box 3034
Florence, Alabama   35631
Telephone: 256-710-8190
Email: alice@alicemartin.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 21, 2020, I electronically filed the foregoing Qui Tam Complaint and Demand for Jury Trial with the Clerk of the Court using the CM/ECF.

I also certify that the foregoing Qui Tam Complaint and Demand for Jury Trial has been furnished by *Overnight Mail* to: Jay E. Town, United States Attorney, United States Attorney's Office, 1801 4th Avenue, North, Birmingham, Alabama 35203; Civil Process Clerk, 1729 5th Avenue North, Birmingham, Alabama 35203 and *by Certified Mail, Return Receipt Request* to the Honorable William Barr, United States Attorney General, Department of Justice, 950 Pennsylvania Avenue, Northwest, Washington, District of Columbia  20530-001 on this 21[th] day of February, 2020.


By: */s/ Alice H. Martin*
Alice H. Martin